1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

UNITED STATES OF AMERICA,       )    Case No. 12-CR-138-TOR
                                )
                     Plaintiff, )    September 27, 2013, AM
                                )    Spokane, Washington
vs.                             )
                                )    Sentencing Hearing
MICHAEL JAMES PAUCKERT,         )
                                )    Pages 1 - 113
                     Defendant. )
_____ )

BEFORE THE HONORABLE THOMAS O. RICE
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

For the Plaintiff:          Mr. Timothy J. Ohms
                            U.S. Attorney's Office
                            920 West Riverside, Suite 340
                            P.O. Box 1494
                            Spokane, Washington 99210

For the Defendant:          Mr. Robert R. Fischer
                            Federal Defenders of Eastern
                            Washington and Idaho
                            10 North Post
                            Suite 700
                            Spokane, Washington 99201

Official Court Reporter:    Ronelle F. Corbey, #2968
                            United States District Courthouse
                            P.O. Box 700
                            Spokane, Washington 99210
                            (509) 458-5283

Proceedings reported by mechanical stenography; transcript
produced by computer-aided transcription.

SENTENCING - SEPTEMBER 27, 2013

1        (Court convened on September 27, 2013, at 9:01 a.m.)

2             THE COURT:  Please be seated.

3             THE COURTROOM DEPUTY:  The matter before the Court is

4    United States of America v. Michael James Pauckert, Case No.

5    12-CR-138-TOR, time set for sentencing.

6         Counsel, please state your presence for the Court and

7    record beginning with the plaintiff.

8             MR. OHMS:  Good morning, your Honor.  Tim Ohms on

9    behalf of the Government.

10            THE COURT:  Good morning.

11            MR. FISCHER:  Bob Fischer, your Honor, on behalf of

12   Mr. Michael Pauckert.

13            THE COURT:  Good morning.

14            MR. FISCHER:  Good morning.

15            THE COURT:  I understand we have some witnesses and

16   evidence to call.  Does that impact the guideline calculation?

17            MR. OHMS:  I don't believe so, your Honor, no.

18            THE COURT:  All right.

19            MR. OHMS:  The exhibits do include letters of which

20   were the subject of the obstruction.  But, I think, those

21   letters have already been provided or submitted through

22   different exhibits.  And, so, I think, that the exhibits that

23   are offered today to that extent will be redundant.

24            THE COURT:  All right.  Well, Mr. Fischer, do you have

25   evidence or witnesses that affect the guideline calculation?

SENTENCING - SEPTEMBER 27, 2013

1        MR. FISCHER:  No, your Honor.  I made my objections,

2   as you know, I -- that could affect the guideline calculation,

3   the obstruction of justice.  But I have no witnesses, Judge.

4        THE COURT:  Okay.  All right.  Well, why don't we take

5   the witness testimony and all the evidence; and, then, we'll go

6   through my findings with respect to the guidelines.  And, then,

7   we'll hear further argument about departures or variances.

8      So, Mr. Ohms, I'll hear from you now.

9        MR. OHMS:  Your Honor, the Government has two

10  witnesses.  Before I call my first witness, the Government also

11  provided an exhibit list; and I've provided Mr. Fischer with a

12  copy of the exhibit -- the proposed exhibits, which were 1

13  through 15.  And I understand from Mr. Fischer that he's not

14  objecting to those.  So, the Government would offer those at

15  this time, Exhibits 1 through 15.

16        MR. FISCHER:  That's correct.

17        THE COURT:  Okay.  Those will be admitted for purposes

18  of this hearing.

19      (Exhibit No. 1, 2, 3-a, 3-b, 4, 5, 6, 7, 8, 9, 10, 11, 12,

20  13, 14, and 15 admitted into evidence)

21        MR. OHMS:  Your Honor, I intend to publish those

22  through the testimony of witnesses using the ELMO.  Would the

23  Court prefer to have its own copy -- hard copy of those?

24        THE COURT:  No, that's fine.  I've got a screen here.

25        MR. OHMS:  All right.  The Government calls Special

SENTENCING - SEPTEMBER 27, 2013
L. McEUEN/DI - OHMS

1    Agent McEuen.

2          THE COURT:  Mr. McEuen, stop there, raise your right

3    hand to be sworn.

4        (LELAND McEUEN, called by the Plaintiff, was sworn)

5          THE COURT:  Have a seat and adjust the microphone.  I

6    want you to state your first and last name.  Spell your first

7    and last name.

8          THE WITNESS:  Leland McEuen, L E L A N D.  M C E U E N.

9          THE COURT:  Please proceed.

10

11                       DIRECT EXAMINATION

12   DIRECT BY MR. OHMS:

13   Q    Sir, how are you employed?

14   A    I am a Special Agent Bomb Technician with the Federal

15   Bureau of Investigation.

16   Q    How long have you been employed as a Special Agent with the

17   FBI?

18   A    Approximately 14 years.

19   Q    And how long have you been a bomb technician?

20   A    Approximately 12 years.

21   Q    And what does that involve?

22   A    I have additional training in rendering safe improvised

23   destructive devices and in the technology of making -- rendering

24   safe such devices.

25   Q    Okay.  Where are you assigned?

SENTENCING - SEPTEMBER 27, 2013
L. McEUEN/DI - OHMS

1  A    Spokane Resident Agency.

2  Q    And how does your position as a bomb technician affect your

3  assignments hear in Spokane, the Spokane area?

4  A    I'm assigned any of the improvised explosive devices that

5  are found or investigated with a federal nexus.

6  Q    And, sir, do you have any additional responsibilities with

7  regard to crimes committed over the Internet?

8  A    Yes.  I'm also the investigator for child pornography.

9  Q    And do you have any specialized training, experience, or --

10  or training or experience in that field?

11  A    Yes.  I've been investigating such crimes for the entire

12  time I've been an FBI agent.  I have additional training in

13  computer forensics, child psychology, and interviewing

14  techniques.

15  Q    All right.  Sir, as part of your official responsibilities,

16  did you become involved in an investigation that included the

17  defendant in this case?

18  A    Yes, I did.

19  Q    And how did you become involved in that investigation?

20  A    On May 23rd, I received a call from the bomb squad that

21  they had located a device and that a suspect had been taken into

22  custody.

23  Q    All right.  Now, did you, ultimately, receive a briefing

24  from law enforcement concerning what they had found?

25  A    Yes.

SENTENCING - SEPTEMBER 27, 2013
L. McEUEN/DI - OHMS

1  Q    Did you personally participate in the recovery of that

2  device?

3  A    Yes.

4  Q    Did you personally participate in the investigation of that

5  device?

6  A    Yes.

7  Q    Did you personally examine the device?

8  A    Yes.

9  Q    All right.  Now, the Court already has summary information

10 about the offense conduct in this case so I'm not going to cover

11 the entire, you know, scope of what you may have done or

12 observed in this case.  But I would like you, focusing first on

13 the explosive device, to tell us where it was located at the

14 residence first.

15 A    Yes.  It was found hanging on a nail in the kitchen inside

16 of a computer bag.  Not the kitchen, the garage.

17 Q    All right.  And what type of device was it?

18 A    Basically, it was a remote controlled pipe bomb, would be

19 the best description of it, with additional shrapnel added to

20 it.

21 Q    What were its components?

22 A    It had a -- what was determined to be a, doorbell --

23 wireless doorbell switch receiver on it that was attached to a

24 ABS plastic pipe.  That pipe had a -- been shaved down on the

25 sides to make one edge of the wall more susceptible to failure

SENTENCING - SEPTEMBER 27, 2013
L. McEUEN/DI - OHMS

1  making it a directional-type device.  And, on top of where that

2  was shaved, there was, approximately, 75 pieces of shrapnel

3  encased in a thin plastic tube.

4  The device was actuated by a doorbell switch, which was

5  also found in the garage on top of some explosive powder; and

6  the lab determined that it was capable of being actuated up to

7  242 meters away.

8  Q    Okay.  "Actuated" meaning you could set it off.

9  A    You could blow it up, yup.

10  Q    How would you blow it up?

11  A    You would push a doorbell switch, which was separate from

12  the device.  That would, then, send a signal to the receiver.

13  The receiver would decode the signal; would then --

14  Q    Where was the receiver located?

15  A    The receiver was, actually, tied to the -- the pipe bomb.

16  Q    Okay.  So, this is a wireless doorbell device?

17  A    Yes.

18  Q    Okay.  So, you'd push the doorbell; and, then, it sends a

19  signal to the receiver.  And, then, what happens?

20  A    The receiver, then, actuates a wire that would heat up.

21  And there were four Christmas light bulbs that had been cut, one

22  of which still had solder on it next to the -- it wasn't,

23  actually, in the bomb itself.  The -- what we call "initiators"

24  -- Christmas tree light bulb initiators were next to the powder.

25  But the way it's designed is that those light bulb would act as

SENTENCING - SEPTEMBER 27, 2013
L. McEUEN/DI - OHMS

1  a electric match, which would, then, initiate the powder.  The

2  powder would expand and speed up the explosion from its own

3  compression.  Then, it would rupture the casing and send the

4  shrapnel out at a high rate of speed.

5  Q    And did the device require any batteries?

6  A    Yes.  It had a three-cell battery attached to the doorbell

7  switch to act as the -- the power source.

8  Q    And could you tell whether the battery was functional when

9  the device was encountered?

10  A    The doorbell switch had an illuminated LED light-emitting

11  diode showing that it was powered on.

12  Q    Did you, in your examination of the device, see any

13  indication of whether it had ever been armed?

14  A    In -- in bomb terms, "arms" means -- "armed" means that it

15  is functioned.  In this case, the circuitry appeared to have

16  been completed.  The wires ended inside the pipe, but there was

17  not an actual Christmas tree light bulb attached to it.  But it

18  did have solder showing that it had had an initiator attached to

19  it at some point.

20      Additionally, there was remains of the same black powder or

21  Pyrodex Powder -- explosive powder inside the pipe.  There were

22  some remains still in the pipe.  So, it appeared that it had

23  been fully armed at one point.

24  Q    Okay.  You mentioned "Pyrodex."  Is that a brand of powder?

25  A    Yes, it is.

SENTENCING - SEPTEMBER 27, 2013
L. McEUEN/DI - OHMS

1  Q    And is that the explosive material that was involved in the

2  manufacture of this explosive device, based upon your

3  observations?

4  A    Yes.

5  Q    All right.  Now, I'm going to show you a couple of

6  exhibits.  First is Government's Exhibit 1.  Could you tell us

7  what that is, sir?

8  A    That is the HP computer case hanging on a nail in the

9  garage of 1412 West Cora Court.

10 Q    And what is the significance of that case?

11 A    That case contained the pipe bomb.

12 Q    Next is Exhibit 2.  What is that, sir?

13 A    That is an x-ray that was taken by the bomb squad of the

14 pipe bomb inside that case in place.

15 Q    Okay.  I think you can indicate by pointing to the -- if

16 you would, by pointing to the screen, you can make marks and

17 indicate the components of the bomb that we're looking at.

18 A    Certainly.  On the upper right-hand corner that I just

19 circled, that's the receiver, the antenna to the doorbell

20 switch.  That's attached to the micro controller for the

21 doorbell switch.  That's the receiver part of it.

22     Below that is the three-cell battery power supply.  You can

23 trace the wires going from the power supply into the pipe bomb.

24 You can see connections made to those wires.  At the end of

25 those wires, there's globs of solder still attached to those

SENTENCING - SEPTEMBER 27, 2013
L. McEUEN/DI - OHMS

1  wires.

2      Beneath that is a test tube looking thing with 75 pieces of

3  shrapnel made out of screws and nails.

4  Q    All right.  Was the shrapnel attached to the bomb itself?

5  A    Yes, it was.  It was taped on.

6  Q    Now, I'm making a mark now, which is, basically, the outer

7  outline.  What is that?

8  A    That is the outline of the HP computer case that the pipe

9  bomb was in.

10  Q    Okay.  So, does that give a sense of scale as to the size

11  of the device?

12  A    Yes.

13  Q    Next is Government's Exhibit 3-a.  Exhibit 2 was an x-ray.

14  Is that correct?

15  A    Correct.

16  Q    And what is Exhibit 3-a?

17  A    3-a shows the pipe bomb after it'd been rendered safe.

18  What we did was we cut off the base of the pipe so that, if

19  there was filler in it, it would vent and, therefore, not

20  explode anymore.

21      And, then, the other piece is the test tube that I cut off

22  of it.  Because the test tube was colored, I couldn't tell

23  whether or not the shrapnel had been spiked with additional

24  things.  And, so, I had to cut that off to examine it to make

25  sure it was safe.

SENTENCING - SEPTEMBER 27, 2013
L. McEUEN/DI - OHMS

1  Q    Okay.  And where would the shrapnel have attached to the

2  bomb?

3  A    You see at the base of the picture there's some black tape

4  that had been cut off?  And that's where the shrapnel was

5  originally attached.  You can also see scoring on the pipe

6  where -- and the shrapnel was directly next to that scoring.

7  Q    Okay.  So, the scoring is this lighter gray area

8  (indicating)?

9  A    Correct.

10 Q    Next is Government's Exhibit 3-b.  I think you can just --

11 for the record, just tell us what that is.  We're not going to

12 go through the individual components because I believe it

13 shows --

14 A    Certainly.  It's a -- it's a color photograph of the same

15 pipe bomb and the ampule, which I put the remains of the powder

16 in that was from the pipe.

17 Q    Okay.  Government's Exhibit 4.  What is that, sir?

18 A    That's a close-up of the scoring or the shaving of the pipe

19 bomb.  It appears to be an attempt to weaken that side of the

20 pipe bomb in an attempt to make it a directional-type explosive

21 device.

22 Q    Well, have you encountered that as a technique in bomb

23 making?

24 A    Yes.

25 Q    All right.  So, that -- it's not just speculation on your

SENTENCING - SEPTEMBER 27, 2013
L. McEUEN/DI - OHMS

1  part?

2  A     No.

3  Q     Now, what -- if we turned this casing over, would it appear

4  the same on the other side?

5  A     No.

6  Q     How would it appear on the other side?

7  A     The other side had no shaving or scoring on it.  It was a

8  regular pipe exterior.

9  Q     All right.  Now, did this shaving appear to have been made

10  with any particular type of device?

11  A     Some type of grinding wheel and some type of knife.

12  Q     Why do you say, "some type of knife"?

13  A     There's additional cuts.  There's -- you can see it a

14  little bit -- an X pattern cut into it to add -- to further

15  weaken the pipe.

16  Q     Okay.  And, without getting into the intentions, what would

17  the effect of that be?

18  A     That would weaken that side of the pipe so the explosion

19  would occur on that particular side of the pipe first.  And,

20  because the shrapnel was directly above that section, it would

21  increase the effectiveness of the shrapnel in a single

22  direction.

23  Q     So, is this a directional device?

24  A     It would cause damage all the way around it, but the most

25  deadly or lethal aspect of the device would be directly behind

SENTENCING - SEPTEMBER 27, 2013
L. McEUEN/DI - OHMS

1  that scoring.

2  Q    All right.  Now, do certain designs have a specific purpose

3  or function?

4  A    Yes.

5  Q    And, based upon your experience, what would be the function

6  of this device?

7  A    This device is what we call a "command detonated."  In

8  other words, the bomber would have to function the device at his

9  particular time and location.  The device would be placed and,

10 then, waited for the events or the person that's targeted to

11 come near the device.  And, then, the bomber would, actually,

12 have to push a button to blow up the device and cause the damage

13 intended.

14 Q    All right.  But can you tell whether this type of design is

15 intended to damage property or damage individuals or -- or what?

16 A    Because it's directional and command detonated, it is more

17 intended to function at a specific event and at a specific

18 location.  My experience with these types of devices is they are

19 designed to be lethal to a specific person.  If you wanted to

20 just damage a building, you could use a simple fuse device; and

21 it would go off at any particular time.  You couldn't specify

22 the exact time that it would go off.

23      So, these types of devices that are command detonated with

24 the directional shrapnel are more designed to -- to kill a

25 specific location or person.

SENTENCING - SEPTEMBER 27, 2013
L. McEUEN/DI - OHMS

1  Q    Okay.  Would you use shrapnel if your intention was to

2  damage a building?

3  A    You could add shrapnel, but you would normally just put it

4  all the way around the device.  The device it's going to have

5  shrapnel from the casing itself.

6  Q    Right.

7  A    So, there's going to be damage all over.  But, by creating

8  a very specific directional device, it's more designed to -- to

9  kill a person.

10 Q    Okay.  Next is Exhibit 5.  What are we looking at there,

11 sir?

12 A    This is in the garage, and you'll see a bottle of Hodgdon's

13 Pyrodex; and above the bottle on the cap itself is the initiator

14 for the bomb.

15 Q    Okay.

16 A    I can circle that for you.

17 Q    Thank you.

18 A    And, then, below that are three Christmas tree light bulbs

19 that have been cut off and their wires stripped consistent with

20 being improvised electric matches to initiate bombs.

21 Q    All right.  So, let me move away from the bomb, then, and

22 ask you about Government's Exhibit 6.  What is that, sir?

23 A    That is the firearm recovered from Cora Court.

24 Q    Okay.  And is that the firearm that is the subject of --

25 which is it?  Count -- Count 1 in the present case?

SENTENCING - SEPTEMBER 27, 2013
L. McEUEN/DI - OHMS

1  A    Yes.

2  Q    All right.  Exhibit 9?

3  A    This was also recovered from Cora Court.  It is a receipt

4  from Sharp Shooting Indoor showing the rental of two .40 caliber

5  handguns, the purchase of .40 caliber ammo, the purchase of 9 mm

6  ammo, as well as hearing and eye protection and, I believe,

7  targets.

8  Q    Okay.  And what was the cost of those items?

9  A    Approximately $80.

10  Q    And you indicated that there were two different types of

11  ammunition purchased?

12  A    Correct.

13  Q    Were either of those types of ammunition consistent with

14  the firearm that we observed in Exhibit 6?

15  A    No.

16  Q    All right.

17          THE COURT:  What's the date of that receipt?

18          THE WITNESS:  It is May 3rd, 2012.  I'm sorry.

19  March 31st.

20          MR. OHMS:  Yeah, I was going to say.

21          THE WITNESS:  March 31st, 2012.

22  Q    (BY MR. OHMS)  I'm going to -- for the -- I guess, since

23  the Court's asked the question, I'm going to zoom in here a

24  little bit.  Did I circle the date appropriately there on the

25  ELMO?

SENTENCING - SEPTEMBER 27, 2013
L. McEUEN/DI - OHMS

1   A    Yes.  March 31st, 2012.

2   Q    All right.  Sir, moving on, did you become aware of a

3   couple of backpacks or -- or go-bags that were found --

4   A    Yes.

5   Q    -- in the residence where the defendant was also found?

6   A    Yes.

7   Q    And were those go-bags associated with the defendant in

8   this case?

9   A    Yes.

10  Q    How so?

11  A    By witness identification.  They were also located in the

12  closet where he was living at the time and in -- next to his

13  personal property.

14  Q    All right.  And one of these --

15  A    I'm sorry.  Plus his identify -- there were identifying

16  documents in one of them.

17  Q    One of these was a green bag and one of them was a

18  camouflage bag?

19  A    Yes.

20  Q    Is that accurate?

21  A    Yes.

22  Q    All right.  With regard to the green bag, did you find any

23  items of interest to you in your investigation?

24  A    Yes.

25  Q    Would you describe those to the Court, please?

SENTENCING - SEPTEMBER 27, 2013
L. McEUEN/DI - OHMS

1  A    I was going to rely on the exhibit, if I may.

2  Q    Okay.  Then we'll use the exhibit.

3  A    Thank you.

4        MR. OHMS:  This is Exhibit 7, for the record.  Whoops.

5  Going the wrong way.  There we are.

6        THE WITNESS:  Okay.  In the -- in the green bag, I

7  located two condoms, a flashlight, a nitrile glove and a Walther

8  PP (sic) -- a Walther handgun look alike that was a BB gun.

9  Q    All right.  But this -- this is not -- I'm circling what

10  looks like a handgun.  That is not a firearm?

11  A    It's not a real gun.  It just looks like one.

12  Q    And the blue item that I've circled?

13  A    The nitrile glove.

14  Q    What is that?

15  A    It's a glove that's usually used for -- when you're

16  possessing chemicals.

17  Q    Next is Exhibit 8.

18  A    This was an Army Strong camouflage bag, and the black item

19  is a full-face mask.  Below that is first aid type tape.  There

20  are two sets of, what we call, flex cuffs.  They are -- I'll

21  circle them.  So, I'm circling them.  These are interlocked to

22  act as handcuffs.  There's a flashlight, some maps, some pens,

23  and a -- and a poncho.

24  Q    And, for the record, what were the maps?

25  A    The maps were of Boise and Washington.

SENTENCING - SEPTEMBER 27, 2013
L. McEUEN/DI - OHMS

1  Q    All right.  Now, did either of these two kits or go-bags

2  cause you any concerns as an investigator?

3  A    Yes.

4  Q    And why was that?

5  A    Based on my investigation of other sex crimes, it appeared

6  to have been a rape kit.  Additionally, in the documentation of

7  Pauckert, we found a name of a sex offender who was involved in

8  a takeover robbery in Idaho in which flex cuffs were used and a

9  gun were also used to take over the store to commit the robbery.

10 Q    All right.  Now, let's talk a little bit about the

11 materials that were found for the manufacture of counterfeit

12 identifications.

13 A    Yes, sir.

14 Q    Were you familiar with those items?

15 A    Yes.

16 Q    And do you recall what was found?

17 A    Yes.  In a Creative Memory kit -- or Creative Memory bag, I

18 found a -- what I would describe as a fake ID making kit.  It

19 had inks.  It had the partially completed and completed fake

20 IDs.  It had templates for Washington State, Washington State

21 IDs, and for Nevada Gaming -- I'm sorry, Nevada Police

22 Department identifications.

23 Q    All right.  Showing you Government's Exhibit 10, what is

24 that?

25 A    That is the Creative Memories fake ID kit.

SENTENCING - SEPTEMBER 27, 2013
L. McEUEN/DI - OHMS

1  Q    And there appears to be a stamp on the bag?

2  A    Yes, sir.

3  Q    Do you recall what that is?

4  A    I don't remember what exactly stamp that was of, but it was

5  part of the kit.  There were -- to create these IDs, you need

6  ultraviolet light and you need a -- I think that was the Seal of

7  the State of Washington, the ultraviolet one.  And he had

8  ultraviolet ink, as well, inside the kit to make fake drivers'

9  licenses?

10  Q    Next is Exhibit 11.

11  A    That's a stencil that we saw purchased under his name that

12  has the similar script to what's on your Washington driver's

13  license.

14  Q    Next is Exhibit 12.

15  A    Those are the Las Vegas Metropolitan Police Department

16  non-gaming identifications.  There were several of these.  This

17  is just an example.

18  Q    Okay.  Did you investigate these sufficiently to determine

19  whether or not the person depicted in the identification is the

20  same person whose name is listed on the identification?

21  A    There were several different IDs; and the ones that we did

22  check, all of them were fake.  The name and the numbers did not

23  match up.

24  Q    With what?

25  A    With the computer data from Las Vegas.

SENTENCING - SEPTEMBER 27, 2013
L. McEUEN/DI - OHMS

1  Q    Okay.  Now, did you, in your investigation, find evidence

2  of computers associated with the defendant?

3  A    Yes, I did.

4  Q    How many?

5  A    Specifically, there was an Acer computer that was

6  identified directly with the -- the -- the defendant.  That also

7  had identification of the fake drivers' licenses that was

8  consistent with what we found in the creative kit.

9       Additionally, the witnesses said that he access to an HP

10 computer that belonged to his girlfriend, Cesley, and that he

11 also used another computer in the household at Cora Court.

12 Q    All right.  When you say the Acer computer had

13 identification of fake drivers' licenses, do you mean -- what do

14 you mean by that?

15 A    It had the templates.  The computer would run the printers

16 that were also located next to the kit, and it had the -- the

17 pictures and the templates that you would put together on the

18 computer to create the IDs.

19 Q    Did you find evidence that the Acer computer, which you

20 associated with the defendant, had been used to access the

21 Internet?

22 A    Yes.

23 Q    Did you find evidence on the computer that the defendant

24 was in possession of pornography?

25 A    Yes.

SENTENCING - SEPTEMBER 27, 2013
L. McEUEN/DI - OHMS

1  Q    Did you find evidence on the computer that the computer had

2  been used to access child pornography?

3  A    There was a graphic that I've learned that is associated

4  with child pornography.

5  Q    What was that?

6  A    It's called Pedobear.  It's a bear-like graphic that is put

7  on by a specific pornographer saying -- that shows that this

8  type of child pornography is good child pornography -- like, the

9  best -- that someone interested in that would be looking for.

10 But I did not find child pornography itself.

11 Q    Based on your experience, why would that image appear on

12 the computer without the actual pornography on the hard drive?

13 A    There's many reasons that it would be there and not the

14 pornography, but the main one is that there are certain images

15 that can be wiped.  There are certain access controls that could

16 be used to not allow the image to remain on the computer.  You

17 could view it, but it would not stay on that computer.

18 Q    What about video?

19 A    Video, specifically, would not be retained unless

20 intentionally retained on the computer.

21 Q    Why would the -- I'm sorry.  What did you call the image

22 again?

23 A    A graphic.

24 Q    Specifically, what type of graphic again?

25 A    Pedobear.

SENTENCING - SEPTEMBER 27, 2013
L. McEUEN/DI - OHMS

1  Q    Pedo?

2  A    Pedo, yeah, as in pedophile.

3  Q    Okay.  Why would the Pedobear graphic remain on the

4  computer if a person accessed -- used the computer to access,

5  say, a video of child pornography?

6  A    Because it's a graphic image, it would have -- it would be

7  downloaded onto the actual computer versus a streaming image,

8  such as, video.

9  Q    All right.  Did you cause the computer to be examined to

10 identify various search strings indicating Internet sites and

11 Internet searches that may have been conducted by the user of

12 the computer?

13 A    I did.

14 Q    And what did you find with that -- with regard to that,

15 sir?

16 A    Specifically, on the Acer, I found that he went to a

17 website called Anarchist Cookbook and accessed a web page,

18 specifically, a collection of pipe bombs.

19      He also accessed many other web sites that had information

20 on how to make pipe bombs.

21      He did YouTube searches on how to forge a check, how to

22 make a pipe bomb that explodes, how to make a fire explosion,

23 how to make a detonator, pipe boom, and homemade bomb.

24      He did Google search strings for how to make a pipe bomb,

25 how to make a pipe bomb black powder, how to make a fire

SENTENCING - SEPTEMBER 27, 2013
L. McEUEN/DI - OHMS

1  explosion pipe bomb, dynamite, dynamite wiki, ABS pipe bomb

2  wiki, dynamite cutaway.

3  Q    Okay.  Let me -- let me stop you just for a moment because

4  you're reading through a list.  I'm wondering, did you compile

5  an exhibit?

6  A    I did.

7  Q    All right.  And is that the first page of your exhibit for

8  use today?  Government --

9  A    Yes, sir.

10 Q    That's Government's Exhibit 13 for the record.

11 A    Yes, sir.

12 Q    All right.  And I believe that you were just referencing

13 Google search strings, which I've pointed to on the exhibit.

14 Are those the search strings that you've just described?

15 A    Yes, sir.

16 Q    All right.  Go ahead and continue your explanation or

17 description of what you -- what you found.

18 A    Certainly.

19        MR. FISCHER:  Your Honor, I think the exhibit speaks

20 for itself unless there's going to be --

21        THE COURT:  Well, we can shorten it up.  I've read it.

22 Go ahead.

23 Q    (BY MR. OHMS)  Okay.  Well, let me just get into some

24 categories.

25 A    Yes, sir.

1  Q    Did you find evidence that he was conducting searches

2  related to various weapons, not just bombs?

3  A    Yes.

4  Q    Okay.  Did you find evidence that he was conducting

5  Internet searches related to the creation of a fake passport?

6  A    On the other computer, I did, yes.

7  Q    Okay.  Did you find evidence that he was conducting

8  Internet searches concerning law enforcement techniques?

9  A    Yes.

10 Q    Specifically, law enforcement techniques in finding a

11 fugitive?

12 A    Yes, on the other computer.

13 Q    Did you find evidence that he had conducted Internet

14 searches related to specific law enforcement officers?

15 A    Yes.

16 Q    Did you find evidence that he'd conducted Internet searches

17 related to specific personnel within the Idaho Department of

18 Corrections?

19 A    Yes.

20 Q    Did that include his then-probation/parole officer -- I

21 believe it's Marla Howard?

22 A    Yes.

23 Q    And did you take any action once you observed that?

24 A    Yes.

25 Q    What action did you take?

SENTENCING - SEPTEMBER 27, 2013
L. McEUEN/DI - OHMS

1   A    I notified her that, based on the search strings, that I

2   thought he may be targeting her.  I called her and notified her

3   of the possible threat against her.

4   Q    Finally, sir, I'm showing you Exhibit 14.  This has been

5   admitted to the Court -- or been provided to the Court,

6   previously, through different pleadings; but would you just

7   identify it for the record for us, please.

8   A    That is letters that I obtained from Cesley written by

9   Mr. Pauckert.

10  Q    And did you review the letters?

11  A    I did.

12  Q    And this specific letter has June 13 written at the top.

13  Is that correct?

14  A    Correct.

15  Q    And did you find any items of interest in the letter?

16  A    I did.

17  Q    And what was that?

18  A    This, as well as other letters, appeared to be Pauckert

19  trying to get the witness to say things that weren't true.

20          MR. FISCHER:  Well, I'm objecting to the opinion.

21          THE COURT:  Sustained.  He can tell me what it says,

22  but --

23          MR. OHMS:  Okay.

24          THE COURT:  -- not what he thinks it says.

25  Q    (BY MR. OHMS)  Since they're of record, we can read them

SENTENCING - SEPTEMBER 27, 2013
L. McEUEN/CR - FISCHER

1  for ourselves.  I think we'll just -- you know, we'll end up

2  arguing about what those things mean.  But I think what's in the

3  letter is of record.

4      But just so we have it identified and know where it came

5  from, what is -- I've put up on the screen Exhibit 15.  What is

6  that?

7  A    That's another letter written by Mr. Pauckert obtained from

8  Cesley Dodge.

9  Q    Okay.  Did you obtain both of these letters?

10 A    I did.

11 Q    And, for the record, how did you obtain them?

12 A    I obtained them from Ms. Dodge.  I should add that the

13 letters were contained in jail mail envelopes with stamps and

14 return addresses as required by the Spokane County Jail.

15         MR. OHMS:  Okay.  Your Honor, I have no further

16 questions of this witness.

17     (Discussion off the record)

18

19                      CROSS EXAMINATION

20 CROSS BY MR. FISCHER:

21 Q    Good morning, Agent.

22 A    Good morning, sir.

23 Q    You and I've talked before.

24 A    Yes, sir.

25 Q    We looked at the bomb together, as a matter of fact.

1  Right?

2  A    Yes.

3  Q    Okay.  So, I'm going to go over a few things of what

4  we're talk -- we talked about today.

5       First of all, May 23rd, 2012, you located the explosive

6  device.  You, personally, looked at it and examined it.

7  Correct?

8  A    Correct.

9  Q    Okay.  And did you have assistance of Spokane Police Bomb

10 Squad?

11 A    Yes, I did.

12 Q    Okay.  And, when you made a report, did they concur in your

13 findings?

14 A    I don't believe there was a findings in their report.

15 Q    About -- about the bomb or --

16 A    That it was a bomb and, basically, how it functioned.  I'm

17 sure they did.

18 Q    All right.  I'm just going to go through some of this

19 stuff.  You said it's, basically, a remote control pipe bomb

20 with shrapnel, 75 pieces attached.

21 A    Correct.

22 Q    And, then, there were components.  And, then, you -- I'm

23 going to show you the Government's Exhibit No. 2.  And I wrote

24 on there what you said.  So -- but I just want to go over this.

25 You also indicated that you dismantled, disarmed bombs?

SENTENCING - SEPTEMBER 27, 2013
L. McEUEN/CR - FISCHER

1  A    Yes.

2  Q    That's your job?

3  A    Yes, sir.

4  Q    And render them safe.

5  A    Correct.

6  Q    Okay.  Now, when you found -- or you -- did you x-ray the

7  case?

8  A    I did not personally, no.

9  Q    Okay.  But you -- did you examine the x-ray before you

10 opened the case?

11 A    Yes.

12 Q    Okay.  And -- and, so, when you look at this, you said it

13 had components and -- but this piece is not armed and ready to

14 go, is it?  The bomb you're looking at is not armed and ready to

15 go.

16 A    It -- based -- I mean, did we know that at the time that we

17 did the x-ray?

18 Q    No.  No.  I'm just asking.  This bomb right here

19 (indicating), or what is a part of the bomb, is not armed and

20 ready to go when you found it.  Correct?

21 A    Correct.

22 Q    Okay.  So, you didn't have to disarm this.

23 A    Yes, we did.  The -- the problem with an x-ray is you --

24 Q    No.  No.  No.  Let me ask you:  Did you have to disarm this

25 piece as it stood?

SENTENCING - SEPTEMBER 27, 2013
L. McEUEN/CR - FISCHER

1  A    Yes.

2  Q    Okay.  And how would you disarm it?

3  A    First of all, we had to remove it from the packaging that

4  it was in.

5  Q    Okay.

6  A    And, then, secondly, we cut off the end because it was ABS

7  pipe.  That was the easiest way to disarm it without destroying

8  all the evidence.

9  Q    Sure.  Okay.  But, if it's not ready to go as constructed

10 right here, right as it stands, it doesn't need to be disarmed.

11 Right?

12 A    You're assuming that we knew that it was --

13 Q    No.  I'm just asking a question.

14 A    And the answer is, yes, you do have to disarm it because we

15 could not tell that it was not a fully functioning bomb as that

16 x-ray discloses.

17 Q    Well, isn't it missing something here?

18 A    The nichrome wire that could have been between those two

19 wires there (indicating) --

20 Q    Yeah.

21 A    -- is so thin it would not show up on an x-ray.  And, so,

22 it could have been filled with powder and it could have had a

23 nichrome wire.  So, at the time, it could have been a fully

24 armed bomb.

25 Q    Okay.  So -- so, this would have shown or not shown that it

SENTENCING - SEPTEMBER 27, 2013
L. McEUEN/CR - FISCHER

1  was -- had Pyrodex in it?

2  A    If it was full, you would not be able to tell the

3  difference in the density.  If it was half full, most of the

4  time we can tell that there's some density difference.  But, on

5  an x-ray, the Pyrodex powder -- if it's -- the bomb is full, you

6  would not be able to tell that it did not have powder.

7  Q    Okay.  So, when you opened it up, you found no powder in it

8  except residue.  Correct?

9  A    Correct.

10 Q    So, that means that at least somebody or Mr. Pauckert had

11 to have put Pyrodex in there and taken it out.

12 A    Correct.

13 Q    Okay.  So, it was, at some point in time, maybe

14 activatable; but it was disarmed by him because there's no

15 Pyrodex in it.  Correct?

16 A    It was unarmed at the time.  Correct.

17 Q    All right.  So -- and somebody would have to do that.

18 A    Yes.

19 Q    You guys didn't.

20 A    No.

21 Q    Okay.  So, somebody would have had to disarm this and

22 not -- and taken the Pyrodex out of it because you found Pyrodex

23 in it.  A little.

24 A    I would -- I would assume that someone had -- had poured

25 some in it at some time, yes.

SENTENCING - SEPTEMBER 27, 2013
L. McEUEN/CR - FISCHER

1  Q    Pyrodex.

2  A    Yes.

3  Q    Because you found Pyrodex in it.

4  A    Yes.

5  Q    Okay.  Now, the doorbell -- that wasn't attached.  Correct?

6  A    Was not --

7       (Interruption by the reporter)

8            MR. FISCHER:  Sure.  I'm sorry.

9  Q    (BY MR. FISCHER)  The doorbell was not attached.  Correct?

10 A    The doorbell receiver was attached.

11 Q    The doorbell receiver, but the doorbell to activate it was

12 not attached.  Correct?

13 A    Yes, you're right.

14 Q    Okay.  And, also, the light bulbs, which would be the

15 initiator?

16 A    Yes.

17 Q    They were found separate and apart from this bomb.

18 Correct?

19 A    Yes.  Next to the doorbell switch.

20 Q    Okay.  Thanks.  Now, this shrapnel you -- you indicated

21 shrapnel, the screws and bolts.  Bolts?

22 A    Nails, I believe.

23 Q    Nails.  And there was nothing -- did you check these for

24 toxins?  Anything toxic on there?

25 A    I did not find anything that appeared to be toxic to me.

SENTENCING - SEPTEMBER 27, 2013
L. McEUEN/CR - FISCHER

1  Q    Okay.  So, you checked and didn't find anything.

2  A    Correct.

3  Q    Okay.  And, now, we're talking about a directional pipe

4  bomb.

5  A    Correct.

6  Q    Okay.  And you were talking about Exhibit No. --

7        MR. FISCHER:  Oh, I'm sorry, your Honor.  For -- for

8  the -- for our purposes, I was just discussing Exhibit No. 2.

9  Government's Exhibit No. 2.  And I'm moving on to Exhibit No. 4.

10 Q    (BY MR. FISCHER)  You were talking about design and

11 function of this scouring of the bomb.  Correct?

12 A    Yes.

13 Q    Okay.  And I think you indicated that you were -- you

14 testified that it was designed to be more intended to function

15 at a specific -- specific event or location.

16 A    That's consistent with command detonated explosives, yes.

17 Q    Okay.  Command detonated explosives means you want to be as

18 far away from that as possible if and when it goes off.

19 A    According to the lab, it could be functioned up to

20 240 meters away.

21 Q    So, you want to be as far away from that as possible,

22 correct, when it goes off?

23 A    Unless you're a suicide bomber, yes.

24 Q    Right.  Okay.  So -- but that's how it's designed, to be

25 away from it.

SENTENCING - SEPTEMBER 27, 2013
L. McEUEN/CR - FISCHER

1  A    Correct.

2  Q    Okay.  Now -- and you said, "event or person."  However, it

3  could be intended for other things, as well.  Correct?

4  A    Such as?

5  Q    Well, let's say I want to make a pipe bomb.  I just want to

6  fool around.  I want to see what it does.  So, I'm going to make

7  it directional; and I'm going to put up a -- oh, I'm going to

8  put a watermelon in front it --

9  A    Okay.

10  Q    -- about 20 feet away to see what it does to that

11  watermelon.

12  A    Yes, sir.

13  Q    So, I stand back 240 meters, let her go, and see if it

14  happens.

15  A    Okay.

16  Q    What's it going to do to that watermelon?

17  A    Destroy the watermelon.

18  Q    Okay.  So, it's got another reason for it.

19  A    The bomb that you're talking about in your hypothetical is

20  more consistent -- you wouldn't need such a sophisticated firing

21  device.  You could have just lit a fuse.  It could have been

22  used in your hypothetical, but it's inconsistent with the amount

23  of time and effort it would make -- it would take to make such a

24  sophisticated device.

25  Q    Well, what if I'm just -- I just want to spend the time and

SENTENCING - SEPTEMBER 27, 2013
L. McEUEN/CR - FISCHER

1  -- and the effort?  I want to see if this thing will really

2  destroy a watermelon.

3  A    I have no experience with that type of device.

4  Q    Okay.  What you're experienced in is disarming devices that

5  you find that somehow have been designed and you know the design

6  purpose.  Correct?

7  A    You can tell the purpose from the design, yes.

8  Q    Okay.  But this has -- and what I'm getting at is this --

9  the purpose of this bomb could be other than an event or person

10  device.

11  A    It would be inconsistent, but it could be used for

12  something else.

13  Q    Okay.  Thanks.  Now, I think we'll move to Exhibit No. 6.

14  And let's -- let's just go over this briefly.  You indicated --

15  you're familiar with weapons being an agent.

16  A    Correct.

17  Q    And did you examine this weapon that is -- a photograph of

18  which is Exhibit No. 6?

19  A    Yes, I did.

20  Q    Okay.  And what is that?

21  A    That is a six-shot revolver, .38 caliber.

22  Q    Is it a Smith and Wesson?

23  A    I believe so.

24  Q    And a .38 Special I think they have -- they call it.

25  A    Yes.

SENTENCING - SEPTEMBER 27, 2013
L. McEUEN/CR - FISCHER

1 Q    Okay.  And, actually, this was a -- there was paperwork

2 found in Mr. Pauckert's personal belongings of -- that this was

3 manufactured in 1905.  Correct?

4 A    I believe it was traced back to the Navy, yes.

5 Q    To the Navy.  Okay.  And that's what some people would call

6 a vintage firearm.  Correct?

7 A    I -- Okay.

8 Q    All right.  Now, when -- when you examined this, had you

9 seen that it had been fired recently?

10 A    I did not examine it for whether it had been fired.

11 Q    Okay.  And you did find paperwork of its -- of the -- the

12 .38 Special's pedigree.  Correct?

13 A    Yes.

14 Q    Okay.

15 A    Oh, wait.  I'm sorry.

16 Q    The pedigree of the firearm.

17 A    We did an ATF trace on it, and it came back to the Navy.

18 The paperwork for it's pedigree?  Like, who bought it and what

19 name they used?  Yes, we did find that in his personal property.

20 Q    Okay.  You also found a receipt, a bill of sale.  Correct?

21 A    Correct.

22 Q    And the receipt, the bill of sale, was made out to Tyson

23 Dodge?

24 A    No.  One of them was made out to Miguel Dodge, which is an

25 aka of Mr. Pauckert.  There was another receipt for Tyson Dodge,

SENTENCING - SEPTEMBER 27, 2013
L. McEUEN/CR - FISCHER

1  yes.

2  Q    Okay.  Well, let's see what we're -- well, let me get

3  through this.  Let's get to Exhibit No. 7.  You refer to this, I

4  believe, as a rape kit.

5  A    There were two kits.  This one would be consistent with it

6  but combined is what they would be, yes.  It's the best --

7  Q    Oh, both of them combined would be a rape kit.

8  A    Yes.  They both had parts that are consistent with what

9  I've talked to other people about what they would use in their

10  crimes.

11  Q    What other people?

12  A    Other pedophiles that have been involved in sex crimes.

13  Q    You talked to other pedophiles about what you found?

14  A    In this kit?  No.  No, in their own.  It's a -- the rape

15  kit is a -- is a gross overview of what was found.

16  Q    "A gross overview."  Speculation.

17  A    What would you call it?

18  Q    I'd call it a bag with stuff in it.  But let's go through

19  this.

20  A    Okay.

21  Q    It's got a condom in it?

22  A    Two of them, yes.

23  Q    Okay.  And -- and do rapists usually use -- wear condoms?

24  A    Yes, they do.

25  Q    Oh.  He had a girlfriend, didn't he?

SENTENCING - SEPTEMBER 27, 2013
L. McEUEN/CR - FISCHER

1  A    Yes, he did.

2  Q    Cesley Dodge?

3  A    Yes.

4  Q    Okay.  Do you know if they used condoms in their love

5  making?

6  A    I know she was pregnant so I doubt it.

7  Q    But you don't know that.

8  A    Well, she was pregnant with his child.

9  Q    Right.  But you don't know whether they used condoms or

10 not.

11 A    At least once they didn't.

12 Q    Okay.  Or something happened to the condom.

13 A    I don't know.

14 Q    Okay.  And, then, you've got a flashlight.  And, now, over

15 here (indicating) in this paperwork you've got a buyer's guide.

16 A    I believe that was for his car.

17 Q    His car.  And, then, you have a Costco bill to the right

18 here (indicating).

19 A    Correct.

20 Q    And what does that have to do with a rape kit?

21 A    Nothing.

22 Q    Okay.  And, then -- and, then, it looks like there's a

23 magazine there.

24 A    Correct.

25 Q    .38 Special?

SENTENCING - SEPTEMBER 27, 2013
L. McEUEN/CR - FISCHER

1  A    No.

2  Q    .40 mag?

3  A    I believe that was to the fake gun.

4  Q    To the BB gun.

5  A    Correct.

6  Q    Okay.  And these gloves -- you say they -- they -- when

7  applying chemicals, people wear these gloves.  Right?

8  A    It's a nitrile glove.  It is specifically designed for

9  chemical use, but it has other uses.

10 Q    Sure.  So, it -- let's say you're gluing two pipes together

11 and you don't want to get the glue on your hands because you're

12 a clean plumber --

13 A    You would use nitrile gloves, yes.

14 Q    Okay.  All right.  And, then -- well, you know,

15 Mr. Pauckert did plumbing work?

16 A    Yes.

17 Q    Okay.  And, then, we go to No. -- Exhibit No. 8.  And this

18 is the other part of the tandem rape kit you describe.  Now, it

19 also has a flashlight like the other kit.  Right?

20 A    Correct.

21 Q    And, then, you have ties used for handcuffing.

22 A    Correct.

23 Q    Okay.  But they're also used in the construction trade,

24 aren't they?

25 A    I've never seen them in this format where they're

1  interlocked.  They're used singularly in the -- in the trades

2  that I know of.

3  Q    When you say, "interlocked," like this down here at the

4  bottom (indicating), 8?

5  A    Yes.  There's two sets that are interlocked just like the

6  police would use for handcuffing.

7  Q    Sure.  Are you a plumber?

8  A    I am not.

9  Q    Do any plumbing on your own?

10 A    Yes.

11 Q    Okay.  And -- but you've never had an opportunity to use

12 these in connection with your plumbing?

13 A    Not in that format, no.

14 Q    Okay.  But you have used them.

15 A    Yes.  Bought ties, yes.

16 Q    Okay.  All Right.  Now, also, over here (indicating),

17 you've got some plumbing tape, don't you?  Or is that adhesive

18 tape?

19 A    That's adhesive.  I think it's first aid tape.

20 Q    First aid tape.  Okay.  And, then, over here (indicating),

21 you have what appear to be multicolored pens.

22 A    Correct.

23 Q    And do you know if they belong to Mr. Pauckert or McKenzie,

24 the child that -- of Cesley Dodge?

25 A    I do not know.

SENTENCING - SEPTEMBER 27, 2013
L. McEUEN/CR - FISCHER

1  Q    Okay.  And over here (indicating) you have a poncho?

2  A    Correct.

3  Q    Okay.  So, if one wanted to go outside and go for a trip in

4  the back country, they may use a map and a poncho, too.

5  A    Correct.

6  Q    Okay.  Now, Exhibit No. 10 is the false identification kit.

7  A    Correct.

8  Q    Okay.  And did you retrieve this from the house during your

9  search or did this -- was this retrieved by the police?

10 A    This was retrieved by me.

11 Q    By you.

12 A    Yes.

13 Q    Okay.  And you also found some printers around.  Correct?

14 A    Correct.

15 Q    And you didn't seize those printers.

16 A    Correct.

17 Q    Because this is really all you needed.

18 A    To do what?

19 Q    To, perhaps, charge Mr. Pauckert with a false

20 identification making device?

21 A    I don't know what the specifics of the law is.  I took --

22 Q    Well, why did you take this?

23      (Interruption by the reporter)

24         MR. FISCHER:  Okay.  Sorry.

25      (Interruption by the reporter)

SENTENCING - SEPTEMBER 27, 2013
L. McEUEN/CR - FISCHER

1        THE WITNESS:  What the specifics of the -- to prove

2   false identification.  If I needed just the kit or if I needed

3   the printers, as well.  I didn't think the printers were

4   necessary evidence.

5   Q   (BY MR. FISCHER)  Okay.  Okay.  Good.  Now, let's talk

6   about client's computers or -- or the computers that you found

7   in the house.  How many computers did you find in the house?

8   A    Three.

9   Q    And do you know that they were accessed only by

10  Mr. Pauckert?

11  A    According to the witness statements, the Acer was only use

12  by Mr. Pauckert.  The HP computer was used by Mr. Pauckert who

13  had his own log on and Cesley Dodge.  And, then, there was a

14  third computer used by Mr. Pauckert and the boys.

15  Q    And the boys.  The boys.  When you say, "the boys," you're

16  talking about Cesley Dodge's two teenage brothers.

17  A    Correct.

18  Q    And, when you looked at one of the computers -- I think it

19  was the Acer?

20  A    Yes.

21  Q    -- you found -- you said you found pornography?

22  A    That was on the HP computer.

23  Q    Which was accessible by who?

24  A    Cesley Dodge and Mr. Pauckert.

25  Q    Okay.  And the -- now, here's the interesting thing is what

SENTENCING - SEPTEMBER 27, 2013
L. McEUEN/CR - FISCHER

1  I want to talk to you about.  Pedobear.  You said you found

2  Pedobear.

3  A    Correct.

4  Q    In a search format?

5  A    No.  No.  Just the graphic image.

6  Q    A graphic image.  Can you explain that to the Court?

7  A    When you search computers, there's different ways of doing

8  it.  One is you search for graphic images, such as, pictures and

9  images, and during that search is when Pedobear appeared on the

10  HP computer.

11  Q    Okay.  But you found no child pornography on the computer.

12  A    Correct.

13  Q    And you -- you know about computers.  Correct?

14  A    Yes, sir.

15  Q    And you -- you indicated that, well, certain images could

16  have been wiped.

17  A    Wiped or never downloaded on the machine itself.  Correct.

18  Q    Or never downloaded.

19  A    The image -- for a computer to retain an image, it has to

20  go into the hard drive.  There are certain images that never go

21  onto the hard drive.

22  Q    Sure.  And there's certain images that can be wiped.

23  A    Correct.

24  Q    But you would find, in your configuration of that hard

25  drive, information about wiping, wouldn't you?

SENTENCING - SEPTEMBER 27, 2013
L. McEUEN/CR - FISCHER

1  A    It's not -- the -- some of the wiping software deletes

2  itself.  So, you have to look for when the next -- the last time

3  the computer was reformatted.  There's several other aspects to

4  observing whether wiping software was used.

5  Q    Okay.  Did you look for that?

6  A    No, I did not.

7  Q    Okay.  So, you really didn't find any child pornography on

8  any computers.  Correct?

9  A    Correct.

10 Q    Now, you were concerned about finding -- I'm going to refer

11 to Exhibit No. 12.  And I think you testified that it was a

12 non-gaming ID.

13 A    Correct.

14 Q    Okay.  Actually, these are work cards, aren't they, for Las

15 Vegas?

16 A    That's what I found out, yes.

17 Q    Okay.  So -- so, you got to have one of these cards in

18 order to work in a casino, a strip club, or something like that.

19 A    Any restricted employment, yes.

20 Q    Okay.  They're not going to get you into any high security

21 police department areas.  Correct?

22 A    Correct.

23 Q    Okay.  In fact, it says, "Non-Gaming" on them.  Right?

24 A    Correct.

25 Q    Okay.  And you don't know who this individual is?

SENTENCING - SEPTEMBER 27, 2013
L. McEUEN/CR - FISCHER

1  A    I do not.

2  Q    Okay.  Do you know if Mr. Pauckert -- did you ask

3  Mr. Pauckert who this individual was?

4  A    No, I did not.

5  Q    Okay.  Do you know if Mr. Pauckert was making money by --

6  or wanted to make money by making false IDs?

7  A    Yes.

8  Q    Okay.  And, certainly, that's not his photo.

9  A    I don't believe so.

10 Q    And you never found any photos of him in connection with

11 these kits?

12 A    Yes, I did.

13 Q    Okay.  Well, why don't you explain that to the Court.

14 A    On the computer, I found templates for fake IDs as well as

15 a search string for fake passports, fake checks, you know, the

16 usual -- not the usual.  And the photos have specific

17 backgrounds to them, color.  Like, in this one, it's --  it

18 looks like an off blue or gray on it.  And, so, there were

19 pictures of Mr. Pauckert with the same type of backgrounds on it

20 with the same chest to top-of-the-head shot, as well.

21 Q    Okay.  But they were not embedded in any passport.

22 A    I did not find any completed ones.  Just the templates and

23 the parts of them for Mr. Pauckert.

24 Q    Okay.  So, the templates are separate and apart from the

25 photographs.

SENTENCING - SEPTEMBER 27, 2013
L. McEUEN/CR - FISCHER

1   A     Correct.

2   Q     Okay.  Now, search strings.  Exhibit No. 13 is the face

3   sheet.  And, then, Page 2, I think, we're discussing Google

4   searches, search strings, et cetera, to -- how to make pipe

5   bombs, et cetera.

6   A     Correct.

7   Q     And, then, the Page 3 is search strings that include

8   searches for information about guns, firearms, and, then, it

9   starts also searching for names.  Christine Jensen?

10  A     Correct.

11  Q     Who's that?  Do you know?

12  A     She's the head of the Idaho Department of Corrections,

13  Fugitive Apprehension Team.

14  Q     Okay.  And Mr. Pauckert, at the time, was a fugitive from

15  Idaho Department of Corrections.  Right?

16  A     Yes.

17  Q     Okay.  And, then, it says, "Coeur d'Alene Marshals."  And,

18  then, it has an address there on Mineral Drive.  You know that

19  to be the -- the U.S. Marshal Department.  Correct?

20  A     Yes.

21  Q     Okay.  And David Harlow?  He's a U.S. Marshal.  Is that --

22  is that true?

23  A     I don't know if he personally is.  It says it is in the

24  search string, I think.

25  Q     Okay.  And it's -- it's also got information about --

SENTENCING - SEPTEMBER 27, 2013
L. McEUEN/CR - FISCHER

1  there's other information that he was looking for, like, whether

2  marshals look for parole violators.  Correct?

3  A    Correct.

4  Q    And, then, it has David Bennett, Sheriff.  Do you know who

5  that is?

6  A    I do not.

7  Q    Do you know who Ron Coleman is?

8  A    I do not.

9  Q    So, you wouldn't know if Ron Coleman's a black bodybuilder.

10  A    I -- when I Googled that, personally --

11  Q    Oh, okay.

12  A    -- Ron Coleman did show up on the Internet as a bodybuilder

13  from Las Vegas but not from Spokane.

14  Q    Right.  A black bodybuilder?

15  A    Correct.

16  Q    And -- and you don't know of an Officer Ron Coleman in

17  Spokane Police Department or Spokane Sheriff's Department?

18  A    I do not.

19  Q    And -- and, then, you indicated that you had called Idaho

20  Probation Officer Marla --

21  A    Howard.

22  Q    -- Howard.  And you indicated that you were concerned that

23  she may be a target?

24  A    Yes.

25  Q    Okay.  And did she tell you that she had received any

1  threats from Mr. Pauckert?

2  A    No.

3  Q    And she didn't -- she told you that, basically, she was

4  looking for Mr. Pauckert.   Correct?

5  A    Yes.

6  Q    Okay.   And -- but she had no idea where he was?

7  A    Correct.

8  Q    No communication with Mr. Pauckert.   She wanted to get him

9  back into her system.   Correct?

10 A    Well, I -- I told her that he was under arrest.

11 Q    Right.   Okay.   Now, I'm going to finalize this with some

12 letters.   And, interestingly, I -- these are Government Exhibits

13 No. 14 -- well, they're 14, 15 -- Government's Exhibits No. 14

14 and 15.   And they consist of a few pages in each one.   So, in --

15 in your report, did you review a report by -- well, actually,

16 this is a report by you done on 12/17/2012, where you provided

17 information in -- in your investigation about Pauckert witness

18 tampering.   And I wrote on this, but I'm going to ask you if you

19 recognize that without the writing.   Is that your name there?

20 A    Yes, that's my report.

21 Q    Okay.   So, you indicated, on -- on 6/8/2012, says, "Just

22 minimize everything to the judge."   These are letters coming --

23 that Ms. Cesley Dodge gave you that came from Mr. Pauckert while

24 he was in jail.   Correct?

25 A    Correct.

SENTENCING - SEPTEMBER 27, 2013
L. McEUEN/CR - FISCHER

1  Q    Okay.  And did you know or were you advised that they were

2  also talking by phone and seeing each other in face-to-face

3  communications during this time?

4  A    I don't remember.

5  Q    But the letters would indicate that, wouldn't they?

6  A    That they were having face-to-face conversations?

7  Q    Yes and phone conversations.  They're not just

8  communicating by letter.

9  A    I believe there's -- there's comments about phone

10 conversations, and there may have been something about

11 visitation in them.

12 Q    Okay.

13 A    But it's been a while.

14 Q    So, these letters are not a complete set of their

15 conversations with each other.

16 A    Correct.

17 Q    Okay.  So, it says, "Just minimize everything to the judge"

18 in the 6/8/2012 letter.

19 A    Correct.

20 Q    And -- and you took that from --

21      MR. FISCHER:  Excuse me, your Honor.  I'm having a

22 hard time.  These were provided in discovery.  And I'm looking

23 for the dates so that they can coincide with -- well, Judge,

24 I -- I provided Defense Exhibit No. D-201.  And these are --

25 consists of three pages of Agent McEuen's report, and the

SENTENCING - SEPTEMBER 27, 2013
L. McEUEN/CR - FISCHER

1  attached letters that I received in United States v. Pauckert

2  Bates No. 0485 through 495.  So, they are, basically, the same,

3  or consist of some of the same, letters that the Government was

4  using; but I'd rather use these because I'm more familiar, your

5  Honor.

6           THE COURT:  I have your exhibit in front of me, and

7  I'm familiar with it.  I've read it.  The confusion is the

8  Government marks them based on the postmarked date, and you've

9  supplied them with a date that's handwritten on the letters.

10          MR. FISCHER:  Oh, I see.  Okay.  All right.  Well --

11          THE COURT:  Do you want me to correlate them for you?

12          MR. FISCHER:  From the -- from the Government's?

13          THE COURT:  Well, the Government's is summarized by

14  Agent McEuen's report.

15          MR. FISCHER:  Correct.  So -- and that's where I'm --

16  I'm having a problem.  As a matter of fact --

17          THE COURT:  Discovery Document Page 486 is the letter

18  dated June 13th.

19          MR. FISCHER:  I have that.

20          THE COURT:  That's referenced as postmarked, I

21  believe, June 14th, the second entry on Agent McEuen's report.

22          MR. FISCHER:  I have that, yes.  Okay.  And I don't --

23  these -- the rest of the Government's letters don't correlate

24  with what I received in discovery.  So, I'm just going to go

25  through what I got in discovery, your Honor, and ask Mr. -- or

SENTENCING - SEPTEMBER 27, 2013
L. McEUEN/CR - FISCHER

1  Agent McEuen just a couple of questions.

2  Q    (BY MR. FISCHER)  You -- you reviewed some of the

3  letters -- the letters that Ms. Dodge provided you that were

4  sent to her by Mr. Pauckert and came to some conclusions.  For

5  example, Pauckert witness tampering, Page 1 of your report,

6  criminal activity and fugitive activity.  But these -- let's go

7  through the first one.

8      You pull out a piece that says, "Just minimize everything

9  to the judge, all the evidence, say I'm a friend whom you didn't

10 know who was on the run."  You provide the rest of the -- the

11 rest of that paragraph.  And that is in a letter right here

12 (indicating), Page 45, it says, "Just minimize everything to the

13 judge."  Correct?

14 A    If you're referring to -- yes, I understand what you're

15 referring to.

16 Q    You see that?  That's -- that's -- that's the excerpt

17 you're taking everything from.  Right?  Correct?

18 A    I'm sorry.  I don't under the question.

19 Q    This is the excerpt from the letter that you're summarizing

20 in your report, verbatim, "Just minimize everything to the

21 judge"?

22 A    Yes.

23 Q    Okay.  "Say I'm a friend," et cetera.  It goes down through

24 and -- and ends with this paragraph here (indicating).

25 A    Yes.

SENTENCING - SEPTEMBER 27, 2013
L. McEUEN/CR - FISCHER

1  Q    Okay.  But the rest of the letter goes on to say, "All my

2  statements can be credited (sic)" -- "can be discredited because

3  I'm a criminal."  So, they say, even in the report,

4  "Mr. Pauckert said you were dating.  Say Mr. Pauckert is also a

5  liar and a criminal.  I don't see the judge punishing you for

6  wondering -- for something you didn't do -- that you didn't

7  know.  And, when you found out, you did the right thing."

8      Now, you're assuming that the judge is the Court sitting

9  here today.  Correct?

10 A    No.

11 Q    Who are you assuming that is?

12 A    She was having custody issues with -- I believe they call

13 her Mack, her one-year-old that Mr. Pauckert was living with --

14 which would cause Mack to have some issues of being with her

15 mom.

16 Q    Okay.

17 A    But it says, "Judge" -- and my title was "Witness

18 Tampering" -- "this is inconsistent with her statements to

19 myself and other agents/investigators."  So, he's telling her to

20 say to a judge something that's not true.

21 Q    This is not relevant to this investigation.

22 A    Sure it is.  Perjury?

23 Q    Well, to this investigation.

24 A    Yes, it is.

25 Q    Your investigation.

SENTENCING - SEPTEMBER 27, 2013
L. McEUEN/CR - FISCHER

1  A   Yes.  I have a person that's telling a witness to lie to a

2  judge.

3  Q   Does it say, "Tell" -- "Lie to him"?

4  A   Yeah, that's my interpretation of that paragraph.

5  Q   That's your interpretation.  Okay.  Thank you.  Now,

6  then -- so, all these references to the judge have something to

7  do with her custody battle between her and her ex-husband or

8  ex-boyfriend, Brad.  Correct?

9  A   No.  If you read the letters, some of them appear to be, in

10  my opinion, to the custody.  Some of them deal with this

11  specific Court.

12  Q   Okay.  Why don't you point out what deals with this

13  specific Court.

14  A   On June 14th, postmarked, he says, "By the way, that thing

15  is legally in Tyson's name.  So, if he wants" --

16  Q   No, we're talking about a judge.  We're talking about

17  intimidating a witness to lie to a judge.

18  A   I think the letters speak for themselves.

19  Q   Okay.  All right.  And I think you're correct.  So, this is

20  the excerpts that you're pulling out of for witness tampering.

21  A   That specific title, yes.

22  Q   All right.

23  A   And there are others for criminal activity and violation of

24  parole and others.

25  Q   All right.  Okay.

1      MR. FISCHER:  May I have a minute, your Honor?

2      THE COURT:  Yes.

3   (Discussion off the record)

4      MR. FISCHER:  Thank you, Agent.

5      THE WITNESS:  Yes, sir.

6      MR. FISCHER:  Thank you, your Honor.

7      THE COURT:  Mr. Ohms, do you have another witness; or

8  are you done with this one?

9      MR. OHMS:  I just had a couple of follow-up questions

10  just to clarify the record.

11      THE COURT:  All right.  Just briefly.

12

13                    REDIRECT EXAMINATION

14  REDIRECT BY MR. OHMS:

15  Q   I just want to clarify a couple of things.  You were asked

16  by Mr. Fischer whether the doorbell was attached to the

17  explosive device, and you indicated that it was not.  As this

18  device is designed to function, based upon your observations,

19  should the doorbell be attached to the device?

20  A   The doorbell trigger should not be attached to the device

21  unless it's a suicide device.

22  Q   All right.  Also, sir, you were asked:  Do you know whether

23  the defendant wanted to make money off of fake identifications?

24  And you answered "Yes."  Why did you answer "Yes" to that

25  question?

SENTENCING - SEPTEMBER 27, 2013
L. McEUEN/REDI - OHMS

1   A    He had told -- or Cesley Dodge reported that he was making

2   money off of selling fake Washington identifications.

3   Q    All right.  And, finally, sir, you were asked a series of

4   questions about using the explosive device that you examined in

5   this case for destroying a watermelon.  And you indicated that

6   you had no experience with that type of device.  And I just -- I

7   wasn't clear on what -- what you meant by that.

8   A    This sophisticated type of device would -- I've never seen

9   it used to destroy inanimate objects.  This is a -- this is a

10  command detonated.  It's designed to be actuated when a specific

11  item or person is in the area.

12          MR. OHMS:  All right.  No further questions, your

13  Honor.

14          MR. FISCHER:  Nothing further, your Honor.

15          THE COURT:  I have one follow-up question.  Are you

16  familiar with the firearm in this case?  The .38 caliber?

17          THE WITNESS:  Yes, sir.

18          THE COURT:  It's a Model 1905.  Does that make it --

19  does that necessarily mean it was manufactured in 1905?

20          THE WITNESS:  No, your Honor.  I believe it was

21  manufactured during World War II.

22          THE COURT:  And, in fact, the record shows the trace

23  went back to 1944.  Is that correct?

24          THE WITNESS:  That would be consistent, yes, your

25  Honor.

SENTENCING - SEPTEMBER 27, 2013
M. HOWARD/DI - OHMS

1      THE COURT:  All right.  Any other questions concerning

2  that?

3      MR. OHMS:  No, your Honor.

4      THE COURT:  All right.  You can step down.

5      THE WITNESS:  Thank you, your Honor.

6      MR. OHMS:  The Government calls Marla Howard.

7   (Witness enters courtroom)

8      THE COURT:  Ms. Howard, please come forward and raise

9  your right hand.  You'll be sworn by the clerk.

10   (MARLA HOWARD, called by the Plaintiff, was sworn)

11      THE COURTROOM DEPUTY:  Have a seat, please.

12      THE COURT:  Please be seated.  Adjust the microphone.

13  State your full and last name for the record and spell your

14  last.

15      THE WITNESS:  It's Marla Howard, H O W A R D.

16      THE COURT:  Thank you.

17

18                    DIRECT EXAMINATION

19  DIRECT BY MR. OHMS:

20  Q    Ma'am, how are you employed?

21  A    I work for the Idaho Department of Corrections Probation

22  and Parole, and I work specifically with a caseload of people

23  who have sex offenses.

24  Q    All right.  What are your official responsibilities on a

25  day-to-day basis?

1  A    I supervisor probation and parolees who are in the

2  community who have been convicted of a sex crime.

3  Q    And do those persons typically have conditions placed on

4  them by the Court?

5  A    They have conditions placed on them by the parole

6  commission.  And, then, they have conditions placed on them by

7  our department policy.

8  Q    And what is your responsibility with regard to those

9  conditions?

10 A    Is to make sure that they comply with those conditions.

11 Q    And how long have you been employed in that capacity,

12 ma'am?

13 A    I've been employed with the Idaho Department of Corrections

14 for seven years.  And, previous to that, I was three-and-a-half

15 years working in Wyoming, same Department of Correction.

16 Q    All right.  In the same type of position?

17 A    Yes.

18 Q    Now, as part of your official responsibilities, did you

19 have responsibility for supervising the defendant in this case?

20 A    I did.

21 Q    And how did that come about, ma'am?

22 A    Michael Pauckert was released sometime around, I want to

23 say, the end of 2008; and he was assigned to my caseload due to

24 his sex crimes.

25 Q    And what was his underlying conviction?

SENTENCING - SEPTEMBER 27, 2013
M. HOWARD/DI - OHMS

1  A    He had two statutory rapes and a lewd conduct with a minor

2  under the age of 16 in Idaho.  And, then, he also did an

3  interstate compact from Montana with, I believe, some burglary

4  charges and some other charges I wasn't -- I'd been supervising

5  him for about four months when I got the Montana case.  So, I --

6  and I've since closed his file.

7  Q    All right.  Approximately, how much time did he serve in

8  custody prior to being released on -- on these conditions?

9  A    I could not give you the exact amount.

10  Q    Okay.  Would that be listed in your violation report?

11  A    It would be.  May I look?

12  Q    Well, the violation report's been filed as an exhibit with

13  a prior pleading.

14  A    Okay.

15  Q    Now, ultimately, did you become aware that Mr. Pauckert was

16  arrested in the State of Washington?

17  A    I did.

18  Q    And did you supervise him, then, from his initial release

19  from custody up until the time of his arrest in the State of

20  Washington?

21  A    There was a seventh (sic) -- seven month -- in between

22  there where I had transferred to the Sandpoint office.  So, for

23  the majority of his supervision, I did supervise him; but there

24  was seven months where he was supervised by Doug Hall while I

25  did the sex offenders in Bonner County.

SENTENCING - SEPTEMBER 27, 2013
M. HOWARD/DI - OHMS

1  Q     All right.  Now, ma'am, did he have any specific conditions

2  related to his place of residence?

3  A     He did.  He was to reside at an approved residence.

4  Q     Okay.  And where -- initially, where was that supposed to

5  be when he was released?

6  A     His only approved residence was with his parents in

7  Hauser -- Hauser Lake, Idaho, on Cloverleaf.

8  Q     Okay.  Did he have any conditions with regard to treatment?

9  A     He was to attend sex offender treatment.

10  Q     Did he have any conditions with regard to the taking of

11  polygraph examinations?

12  A     He was to take a polygraph minimally annually.  At a

13  minimum, once every year.

14  Q     For what purpose?

15  A     Primarily -- initially, it was for full disclosure

16  polygraph to disclose all of his victims.  And, then, after

17  that, it was a maintenance polygraph to make sure that he was

18  complying with the terms of his parole and had not committed any

19  other crimes.

20  Q     Okay.  Did he have any special conditions with regard to

21  the use of alcohol or the visiting of establishments whose

22  primary purpose was the service of alcohol?

23  A     Yes.  He was not to enter any bars, and he was not to

24  consume any alcohol.

25  Q     Did he have any special conditions with regard to entering

1  into relationships with women?

2  A    Two special conditions, No. 8 and 9, of our Sex Offender

3  Agreement of Supervision.  8 specifies that he cannot enter into

4  a relationship with any woman unless his treatment provider and

5  probation officer have met this person and are able to know that

6  this person can give effective consent.

7        And, then, No. 9 states that they cannot enter into a

8  residence (sic) -- or into a relationship with a woman or a man

9  if they are -- have any, even, joint or full custody of a minor

10 child.  Nor can they reside in a home where minor children

11 reside.

12 Q    Did he have any special conditions related to the

13 unsupervised contact with children, generally?

14 A    He was to have no unsupervised contact with minors under

15 the age of 18.

16 Q    Did he have any special conditions related to the

17 possession of pornography?

18 A    He was not to possess or view or have any access to

19 pornography.

20 Q    Did he have any special conditions related to the -- his

21 access to the Internet?

22 A    He was allowed no Internet access unless it was through Job

23 Service or a college if he was attending college.  He could

24 access it only for college or work purposes.

25 Q    All right.  Now, ma'am, as -- during the course of your

SENTENCING - SEPTEMBER 27, 2013
M. HOWARD/DI - OHMS

1  supervision of the defendant, did you -- prior to his arrest in

2  the State of Washington, did you have information that he was

3  violating any of these conditions other than the condition

4  related to the polygraph?  And we'll set that aside and talk

5  about it separately.

6  A    I knew that he was -- he was violating the polygraph, and I

7  knew that he was violating curfew.  I was made aware of the fact

8  that he had been violating all of the conditions that he

9  violated around the middle of March, 2012.

10  Q    And how did you become aware of that?

11  A    I received a phone call from one of his -- I guess she was

12  an ex-girlfriend who was pregnant.  And she, then, filled me in

13  on that and, then, further investigation lead to other

14  allegations.  But, up until March 12th, 2012, I had no idea of

15  the extent of his violations.

16  Q    All right.  And who was that that contacted you?

17  A    Her name was Felicia Murph.

18  Q    And what was it about the information she provided that

19  lead you to believe that he was in violation of conditions?

20  A    Well, she had met him -- according to her information,

21  she'd met him a year before in a bar.  They went to a bar.  They

22  had some drinks with a friend.  Felicia let me know that she was

23  pregnant -- around five or six months at that time, which was

24  March, 2012 -- and that he had a child that was born around the

25  first of the year to another woman and --

SENTENCING - SEPTEMBER 27, 2013
M. HOWARD/DI - OHMS

1  Q    I'm sorry.  Did you know about the other woman?

2  A    Pardon me?

3  Q    Did you know about the other woman?

4  A    I did not know.  He -- no, he -- Michael was not in any

5  approved relationship.  Previously, he had been approved to date

6  his, then, ex -- or, now, ex-wife.  But, since he got a divorce

7  from his wife, he was not allowed to enter into a relationship

8  without approval.

9  Q    Okay.  So, the information that he had a child and that a

10 second woman was pregnant was an indication of violations of his

11 conditions of --

12 A    Yes.  Felicia --

13 Q    -- parole.

14 A    Yes.

15 Q    Did you subsequently learn of an additional relationship

16 that was unapproved?

17 A    I did.  I only learned of the one with Cesley after his

18 arrest in Washington.

19 Q    Who are you referring to?

20 A    Okay.  He had the Baby Mama 1, Baby Mama 2.  So, it'd be

21 Baby Mama 3, Cesley Dodge.

22 Q    All right.  Is that where he -- the woman with whom he was

23 residing at the time of his arrest?

24 A    Yes.

25 Q    And do you know whether Cesley Dodge had custody of a minor

SENTENCING - SEPTEMBER 27, 2013
M. HOWARD/DI - OHMS

1  child at that time?

2  A    According to the reports and Cesley herself stated that she

3  had a year-and-a-half-old child.  Felicia also had a nine or

4  ten-year-old child that -- and he resided in both those women's

5  homes.

6  Q    Were either of those women approved as chaperones?

7  A    No.

8  Q    And what does that mean?

9  A    A chaperone agrees to supervise the defendant when they are

10 around children and make sure that they are not allowed to

11 physically -- physically touch the child and make sure they're

12 never alone with the child.

13 Q    All right.  Were you aware at the time of evidence that the

14 defendant was using a computer to access the Internet?

15 A    I was.  Felicia gave me his Facebook account and his email

16 account.

17 Q    And what did you learn based on that?

18 A    He had closed the Facebook account and the other account as

19 soon as he found out that she had contacted me.  So, I was

20 unable to access either one of those accounts.

21 Q    Did you learn what identity he used on -- in accessing the

22 Internet?

23 A    Che'Miguel is, I think, what his -- his Facebook account

24 was under.

25 Q    All right.  Now, let's talk about the polygraphs for a

SENTENCING - SEPTEMBER 27, 2013
M. HOWARD/DI - OHMS

1  moment.  What was the violation that you were concerned about

2  with regard to the polygraphs?

3  A    The major concern that I had with the polygraphs was he

4  kept -- initially, he kept failing it.  And, then, in 2009, I'm

5  told -- or 2009 was the last polygraph.  And every time I would

6  tell him "You need to do a polygraph," he would say, "Yeah, I

7  will.  I will get it done."

8       And, then, due to, probably, just having too many people on

9  my caseload, I was -- I let him slip through the cracks.  It

10 was, actually, two years before I told him to get another

11 polygraph.  I -- actually, I told him to get a polygraph; and I

12 probably should have arrested him for not doing the polygraph.

13 But it kind of slipped past me.

14 Q    Okay.  So, was his last polygraph completed on October 26,

15 2009?

16 A    It was.

17 Q    Did he fail to appear for a polygraph on May 25, 2011?

18      (Interruption by the reporter)

19 Q    Did he fail to appear for a polygraph on May 25, 2011?

20 A    He did.

21 Q    Did he fail to appear for a polygraph on March 29, 2012?

22 A    He did.

23 Q    Now, through the supervision itself, including the use of

24 the polygraphs, did you learn information about the nature and

25 number of other minor victims of Mr. Pauckert?

1  A    Mr. Pauckert, from the time he was 18, had 10 --

2         MR. FISCHER:  Well, I'm going to object, your Honor.

3  This -- we're going way outside the scope here of what this case

4  is all about.  You know --

5         THE COURT:  Well --

6         MR. FISCHER:  I don't -- I don't have any reports on

7  what these polygraphs were or anything like that.  I mean,

8  Officer Howard is -- I understand that she's looking for

9  Mr. Pauckert and that he jumped and -- and left.  But now we're

10 getting so far afield that I don't know where we're going with

11 this.

12        THE COURT:  All right.  Mr. Fischer, your objection's

13 sustained.  Mr. Ohms, I understand that the State of Idaho may

14 or may not revoke Mr. Pauckert's parole.  But I don't intend to

15 get into the details of that.

16        MR. OHMS:  I understand, your Honor.  I --

17        THE COURT:  Only as it relates to the sentencing here.

18        MR. OHMS:  I -- may I explain to the Court why I

19 believe it does relate?

20        THE COURT:  Yes.

21        MR. OHMS:  I think, under the 3553 factors, the Court

22 is asked to consider this defendant as a whole person.  And the

23 defense has proffered to the Court an hour-long video in which

24 these issues are discussed, including what -- what exactly it

25 was that he was convicted of.  In essence, the defense has

SENTENCING - SEPTEMBER 27, 2013
M. HOWARD/DI - OHMS

1  proffered an explanation and characterization of Mr. Pauckert's

2  violations or offenses relating to sexual misconduct with

3  minors.  That's been proffered.  And -- and it's -- it's not an

4  accurate portrayal based upon this witness's information and

5  experience.

6       So, in part, I was trying to correct the record that's

7  already been proffered by the defense.

8            THE COURT:  Well, isn't that, in part, already

9  corrected by the Presentence Investigation Report itself?

10           MR. OHMS:  It's not because there's much more, I

11  believe, specific information than what's been provided to the

12  Court.  And I -- I respect the Court's ruling because the Court,

13  ultimately, determines what's of interest to it for purposes of

14  sentencing.  But I do think it may be of value for -- to be

15  placed on the record, at least, that the victims that we're

16  talking about are not simply, you know, 16-year-old girls who

17  are somehow precocious and acting older than they are in

18  consensual relationships; that there is -- that there's more to

19  this that caused the supervision to be -- that caused these

20  conditions to be serious conditions and, ultimately, provoked

21  the defendant to abscond.

22       And, so, it's -- it's part of the -- the whole story here

23  of the case.  The defendant had failed polygraph examinations.

24  He was failing to take polygraph examinations.  He references

25  polygraph examinations in letters that have been proffered to

SENTENCING - SEPTEMBER 27, 2013
M. HOWARD/DI - OHMS

1  the Court.  And that kind of goes to the heart of -- of what

2  happened in this case.

3         THE COURT:  Well, what further questions do you have

4  of Ms. Howard that --

5         MR. OHMS:  My question, your Honor, with regard to

6  that, was to ask her what was learned about Mr. Pauckert's --

7  the -- the nature and number of victims that he had.  In other

8  words, what were the -- what was the age range of victims and --

9         THE COURT:  All right.  I'll allow that.

10        MR. OHMS:  -- what was the number?

11        THE COURT:  I'll allow that.

12        MR. FISCHER:  If -- if I might, I think if the Court

13  will -- is going to allow that, which it has indicated it is,

14  then I would ask that either passed or what the results of the

15  polygraph were.  It shouldn't be used as an indication that -- I

16  mean, it could be used as an indication that he passed -- he --

17  he didn't pass a polygraph or the polygraph was not

18  inconclusive.  But it can't -- passing or failing a polygraph

19  can't be brought in to determine whether a violation actually

20  occurred and what type of violation.

21     So, I would ask the Court to limit these questions very

22  carefully.

23        THE COURT:  I understand your objection.

24        MR. OHMS:  And I think I do as well, your Honor.

25        THE COURT:  Pose the question again.

SENTENCING - SEPTEMBER 27, 2013
M. HOWARD/DI - OHMS

1      MR. OHMS:  All right.

2  Q   (BY MR. OHMS)  Through the polygraph process, are there, in

3  fact, interviews that are conducted with Mr. Pauckert?

4  A   Yes.

5  Q   All right.  So, did he, then, make statements or admissions

6  about the nature and number of his victims?

7  A   He made disclosures, yes.

8  Q   Disclosures.  Fine.  And, based upon those disclosures,

9  what was the age range of the victims?

10 A   1-year-old, 11-year-old, 12-year-old, and, then, several

11 13, 14, 15.

12 Q   And how -- what was the -- the number that, ultimately, was

13 disclosed?

14 A   Including the 1-year-old, it would be 11.  And, then, if

15 you included that he was 11 -- so he was a minor -- at 11 with a

16 male 11-year-old.  So, 12.

17 Q   In -- ultimately, did you seek a warrant for Mr. Pauckert's

18 arrest?

19 A   I did.

20 Q   And why did you do that?

21 A   He had absconded from supervision, he failed to take a

22 polygraph, and he had been around minor children.

23 Q   And, approximately, when did you seek that warrant?

24 A   I was notified of it around March 12th.  So, around -- the

25 end of March he failed to take a polygraph, and I requested the

1  warrant in April.

2  Q    And you were notified of what, ma'am?

3  A    Oh, the fact that he had been violating his probation.

4  That was March 12th.  And, so, the end of March he was to take a

5  polygraph.  He didn't do that so, in April, I requested a

6  warrant.

7  Q    All right.

8  A    And I would have to look at my probation -- or parole

9  violation to tell you the exact date.

10  Q    Did you have information at that point that he was no

11  longer living with his parents?

12  A    I did.

13  Q    Did his parents ever report that to you?

14  A    They did not.

15  Q    Did you -- based on your experience in supervising

16  Mr. Pauckert, did you have contact with his parents?

17  A    I did.

18  Q    Did you ever experience his parents attempting to protect

19  or shield him?

20  A    Yes.

21         MR. FISCHER:  I -- this is speculation.  This --

22         THE COURT:  No, overruled.  She can answer if she

23  knows.

24  Q    (BY MR. OHMS)  How so, ma'am?

25  A    When he had absconded and I had pretty much figured out

SENTENCING - SEPTEMBER 27, 2013
M. HOWARD/DI - OHMS

1  that he had absconded, I, actually, went out there and talked to

2  his mom.  And she reminded me that she was his mother.  And, you

3  know, her job as a mother was to protect her son.

4      So, I did not ask her to have him call me or to do anything

5  like that.

6      And, then, during his parole violation, she had recanted

7  part of what she had told me at his house.  And -- and that was

8  in an effort to protect her son.  I mean, she's a mom.

9  Q    I'm not asking you to make a judgment about it.

10  A    Okay.

11  Q    I'm just asking for the record.  Do you know of any

12  legitimate reasons why the defendant would -- would have a

13  reason to have your home address or -- or personal data about

14  you?

15  A    No reason, whatsoever.

16          MR. OHMS:  Thank you very much, ma'am.  Your Honor, I

17  have no further questions of this witness.

18          THE COURT:  Mr. Fischer.

19          MR. FISCHER:  Can I have a moment, your Honor.  Just

20  one --

21          THE COURT:  Yes.

22      (Discussion off the record)

23

24  /  /  /  /  /

25  /  /  /  /  /

SENTENCING - SEPTEMBER 27, 2013
M. HOWARD/CR - FISCHER

### CROSS EXAMINATION

CROSS BY MR. FISCHER:

Q    Excuse me.  Good morning, Officer Howard.  Did -- did -- while Mr. -- well, let me just -- have you ever talked to Cesley Dodge?

A    I spoke to her once.

Q    Okay.  And do you recall when that was?

A    Off the top of my head, no.

Q    Okay.  Was it before Mr. Pauckert's arrest in May, 2012?

A    It was.

Q    Did you call her at home, or did she call you?

A    I called her on a phone number that was given to me by Felicia.

Q    Okay.  And did you ask if Mr. Pauckert was there?

A    No.

Q    Okay.  What was the tone -- or what was the reason for the call?

A    I could not find Mr. Pauckert, and he was not checking in.

Q    And -- and why did you call Cesley Dodge?

A    Because Felicia felt that she might know where he was at.

Q    But you never asked Ms. Dodge if Mr. Pauckert -- if she knew where Mr. Pauckert was?

A    I did ask her if she knew where he was.

Q    Okay.  And what did she say?

A    No.

SENTENCING - SEPTEMBER 27, 2013
M. HOWARD/CR - FISCHER

1   Q    Okay.  All right.  And that was the end of it.

2   A    No.  That -- there was, actually, further phone

3   conversation.

4   Q    You called her again a couple of times or --

5   A    No.  That just was -- there was more involved in that

6   phone -- I only talked to her one time.

7   Q    Oh, one time.  Okay.  Okay.  All right.  And Mr. Pauckert

8   knew that you wanted to take additional polygraphs.

9   A    Yes.

10  Q    Okay.  And that was just before he, kind of, jumped ship

11  into --

12  A    No.

13  Q    No?

14  A    He had been told several times in the last two years to do

15  a polygraph.

16  Q    Right, but this time you demanded it in 2011?

17  A    I gave him a deadline in 2012.

18  Q    And what was the deadline?

19  A    He was to call immediately and schedule an appointment.

20  Q    Okay.  And what -- what was that time he was to schedule an

21  appointment?  You've got a deadline.  What deadline?

22  A    Well, the deadline depends on the polygrapher's schedule.

23  So, he was to call the next day and schedule a polygraph.

24  Q    And did he?

25  A    He did.

SENTENCING - SEPTEMBER 27, 2013
GOVERNMENT RESTS

1  Q    Okay.  And what date was he to take the polygraph?

2  A    I would have to look at my notes.  It was sometime the end

3  of March.

4  Q    Of 2012.

5  A    Yes.

6  Q    Okay.  Thank you.

7         MR. FISCHER:  I have nothing else, your Honor.  Thank

8  you.  Thank you.

9         THE COURT:  All right.  Anything further, Mr. Ohms?

10        MR. OHMS:  No, your Honor.

11        THE COURT:  All right.

12        MR. OHMS:  May this witness be excused, your Honor?

13        THE COURT:  Yes, Ms. Howard.  You may be excused.

14  Thank you.

15     (Pause in the proceedings)

16        MR. OHMS:  Your Honor, the Government has no

17  additional evidence to present.

18     (Government rests)

19        THE COURT:  All right.  Mr. Fischer, do you have any

20  witnesses to call or evidence to present?

21        MR. FISCHER:  No, your Honor, only the exhibits and

22  the supplements that I've provided previously.

23        THE COURT:  And those have been provided to the Court,

24  and the Court has reviewed those.

25        MR. FISCHER:  Very good, your Honor.

SENTENCING - SEPTEMBER 27, 2013
OBJECTIONS TO THE PRESENTENCE INVESTIGATION REPORT

1    THE COURT:  All right.  As well, I should put on the
2  record, I've reviewed the defense sentencing video.
3    All right.  Mr. Ohms, I was looking through the material.
4  Maybe you could help me.  I want, in my notes here,
5  Ms. Howard's dates in her report.  If you could, direct my
6  attention to when she asked Mr. Pauckert to schedule that
7  polygraph in March of 2012.
8    MR. OHMS:  I believe, if the Court would look at ECF
9  44, there's a -- are two exhibits that are listed and the second
10  of those is a report of parole violation and that has --
11  actually, sets out when the defendant was sentenced in Idaho
12  and -- and, I believe, you can determine when he went on
13  probation.  As far as the exact dates of the -- when he was
14  requested to take polygraphs, those are also set forth in that
15  report.
16    From the testimony that the Court just heard, that was -- I
17  believe the testimony was that he failed to -- that he had not
18  completed a report since October 26, 2009.  Excuse me, not
19  completed a polygraph; that he failed to appear for a polygraph
20  on May 25, 2011, and on March 29, 2012.
21    THE COURT:  All right.  I see that.  All right.  Does
22  the Government have any objections to the Presentence
23  Investigation Report?
24    MR. OHMS:  Just what I -- I filed with the Court, your
25  Honor.

SENTENCING - SEPTEMBER 27, 2013
OBJECTIONS TO THE PRESENCE INVESTIGATION REPORT

1      THE COURT:  Well, those have been corrected in the

2  report.  So, are there any other objections in the report?

3      MR. OHMS:  No, your Honor.  No, your Honor.

4      THE COURT:  All right.  I'll hear from you,

5  Mr. Fischer, as to the Presentence Investigation Report.  Have

6  you discussed with your client and read the Presentence

7  Investigation Report fully with your client?

8      MR. FISCHER:  Yes, your Honor.

9      THE COURT:  And I note that you filed objections, but

10  the report was revised.  Do you have any continuing objections

11  to the revised Presentence Investigation Report?

12      MR. FISCHER:  I do, your Honor, as to I still hold to

13  the objection of the obstruction of justice under 3C1.1.  That

14  was not corrected.  Although, I -- I do understand that the

15  amended PSR has withdrawn the increase for -- in connection

16  with -- on Page 13, Paragraph 44, was deleted.  And it has been

17  reducing -- it's reduced the -- the base -- or the adjusted

18  offense level to 24.  I think that, you Honor, under -- under

19  the adjustment for obstruction of justice, considering all the

20  information, and I know it's been a lot of information that this

21  Court had to digest to come to that, whether two points should

22  be added for willfully obstructing or impeding or attempting to

23  obstruction the administration -- the administration of justice.

24      There are several factors here, your Honor, that -- that

25  have to be taken into account.  And, I think, first, the -- the

1  biggest part of this is the obstruction of justice section in

2  the Guidelines in the 3C1.1 themselves because the comments as

3  to the amended -- the addendum to the PSR indicates that

4  Mr. Pauckert obstructed justice under commentary notes 4(A),

5  4(B), and 4(D).

6      When you -- when you look at the guidelines, your Honor,

7  the obstructing and related adjustments under 3C1.1 break down

8  into, and as I indicated in my objection, two parts:  Part 4 and

9  Part 5.  And Part 4 is -- is a -- some examples of and -- of

10 covered conducted where Part 5 is examples of uncovered conduct

11 or conduct that would not produce a two-point enhancement.

12     Under 4(A) is "threatening, intimidating, or otherwise

13 unlawfully influencing a co-defendant, witness, or juror,

14 directly or indirectly, or attempting to do so."  There's

15 nothing in these letters that the agent suggests and that the

16 United States Probation Office picked up on -- those are five

17 letters that are outlined in the PSR -- nothing in them are

18 threatening, intimidating, or otherwise unlawfully influence a

19 witness or juror or a codefendant.

20     Now, the agent -- McEuen, the agent, spoke of that he

21 believes that this was certainly directed at -- in connection

22 with the -- the comments about the judge and telling what the --

23 Mr. Pauckert telling Cesley Dodge what -- what she should tell

24 the judge are a series of ongoing discussions between Ms. --

25 Ms. Dodge talking and asking the advice from Mr. Pauckert, "What

SENTENCING - SEPTEMBER 27, 2013
OBJECTIONS TO THE PRESENTENCE INVESTIGATION REPORT

1    should I do with all this in my custody battle over Mack,"

2    McKenzie, her daughter.  And he's simply providing, "I'll tell

3    you what I'd do."  But he's not threatening, intimidating, or

4    otherwise unlawfully doing anything.  He's trying to give her

5    some advice that she can take it or leave it.

6        It's not -- under (B), it's not committing or suborning or

7    attempting to suborn perjury and -- and including during the

8    course of a civil proceeding.  But we're talking about

9    information that is directly related "to the investigation,

10   prosecution, or sentencing of the defendant's instant offense of

11   conviction, ..."  That's right in Application Note, In General,

12   under Paragraph 1:  "This adjustment applies if the defendant's

13   [obstruction] ... occurred with respect to the investigation,

14   prosecution, or [sentence] ... of the instant offense ..."  None

15   of that is in connection with the instant offense.

16       So, the other apparent -- well, then, we're left with "What

17   about the gun, the .38 Special?"  Well, what about the three

18   printers?  Well, let's -- if you look at "(D) destroying or

19   concealing or directing or procuring another person to destroy

20   or conceal evidence that is material to an official

21   investigation ..."  Well, the -- if the Government -- the

22   Federal Government Agent and the Spokane Police Department did

23   not take the printers as evidence and, as you've heard from

24   Agent McEuen, they are not of evidentiary value, they didn't

25   take them as evidence, then, that's not material to this

SENTENCING - SEPTEMBER 27, 2013
OBJECTIONS TO THE PRESENTENCE INVESTIGATION REPORT

1  investigation.  Mr. Pauckert said, "Get rid of them.  They're

2  junk.  There's nothing to save in that junk."  And that's --

3  basically, they're taking up space.  Mr. Pauckert does not have

4  the ability to, while he's sitting behind bars, have the ability

5  to get rid of his materials -- material property -- the property

6  of his own.  He has to rely on Cesley Dodge to do that.  So,

7  he's just giving her information about that.

8      As it comes to the gun, your Honor, the .38 Special,

9  there's bantering back and forth of whether Tyson wants to take

10  ownership of that gun.  Well, the gun -- the firearm's already

11  been seized.  Everybody knew that.  And Mr. Pauckert's telling

12  Cesley, "If Tyson wants it, step up and grab it because he's got

13  a legal receipt for it because his name's on it."

14      Now, the interesting thing about this, Judge, is ownership

15  is not possession.  In other words, he admitted to possessing.

16  He's never denied possessing the firearm.  When it comes right

17  down to whether he admitted or denied, he has stepped up.  He's

18  admitted to possessing the ID kit, the firearm, and he still

19  believes that the firearm is rightfully in Tyson's name.  And,

20  if he wants it -- now, Mr. Pauckert has given up all right,

21  title, and interest in the gun.  He doesn't want it.  And that's

22  part of the plea agreement.  And that's put out -- that's also

23  in the PSR.

24      But the difference between ownership and possession is

25  huge.  So, he didn't deny possession.  And -- and, I think,

SENTENCING - SEPTEMBER 27, 2013
COURT'S ORAL DECISION RE:  OBJECTIONS TO THE PSIR

1  that's what you have here is -- and he's not asking to destroy

2  it or conceal it or procuring it -- the evidence.  It's -- it's

3  already in evidence.

4      The interesting part of this, if the Court saw that it was

5  under 5, "Examples of Conduct Ordinarily Not Covered" but can be

6  taken into account or applied to the offense level under the

7  guideline structure.  So, in other words, it can -- the Court

8  can look at this -- as an example, if it looked under 5(C) and

9  found that "providing incomplete or misleading information, not

10 amounting to a material falsehood, in respect to a present -- in

11 respect to a presentence investigation;" that's the only thing

12 that -- that -- he didn't make any false statements under oath.

13 He never gave a false name or identification.  He did avoid

14 fleeing from arrest, but that is not in the context of what this

15 5 of conduct ordinarily not taken into account covers.

16     He didn't lie -- well, about this -- it's not about a

17 pretrial release.  So, that's not possible there.

18     These -- these -- if one wants to speculate that all these

19 comments were done to interfere with a investigation, the

20 investigation had already been completed.

21     So, that's -- that's my comments on the PSR.

22         THE COURT:  All right.  Let's resolve that for the

23 record so you know where we're going from here.

24     The Court has considered the obstruction of justice under

25 3C1.1.  I'd note for the record that I agree with you with

SENTENCING - SEPTEMBER 27, 2013
COURT'S ORAL DECISION RE:  OBJECTIONS TO THE PSIR

1   respect to Application Note 4(A).  There is no evidence the

2   defendant threatened, intimidated, or unlawful interference or

3   influence another person.  The "unlawful" there, in my mind,

4   covers giving something of consideration, like, a bribe or money

5   or paying off a juror or witness.  It covers those unlawful

6   influence that aren't threats or intimidation.

7        So, I agree with you that Application Note 4(A) does not

8   apply.

9        However, Application Note 4(B) specifically provides that

10   attempting to suborn perjury does apply, does qualify the

11   defendant for two points for obstruction of justice.  You've

12   made an argument that it's not related to the instant offense,

13   but the language of 3C1.1 is not only the instant offense of

14   conviction but any relevant conduct and any closely related

15   offense.  So, suborning perjury, which merely is asking another

16   person not to tell the truth or the full truth, does qualify for

17   an enhancement.

18        Additionally, while less strong, I also note that

19   Application Note 4(D) includes "attempting to do so."  That is,

20   "... directing or procuring another person to destroy ...

21   evidence that is material ... or attempting to do so;"  The

22   letters -- and they're outlined in Paragraphs 28, 29, 30, 31,

23   and 32 of the Presentence Investigation Report and are backed up

24   by the physical documents that are in evidence, clearly ask

25   Ms. Dodge to color her testimony, including how many days or

SENTENCING - SEPTEMBER 27, 2013
COURT'S ORAL DECISION RE:  OBJECTIONS TO THE PSIR

1  nights he had spent with her, which is clearly relevant to the

2  SORNA violation.  He tells her to get rid of the printers.  I am

3  extremely cognizant that printers are often used to tie

4  criminals back to the crimes they've committed.

5      And these letters all occurred shortly after he was

6  indicted and arrested and substantially before the trial was

7  scheduled in this case or Mr. Pauckert plead guilty, which is

8  June of 2013.  These all occurred a year prior.  So, they did

9  have the potential to affect not only the investigation but the

10  trial of the case that was then pending.

11      I also note for the record United States v. Phillips.  It's

12  a Ninth Circuit case, 2004.  Do not require materiality when the

13  defendant attempts to influence a witness or have a witness

14  perjure herself.  The attempt alone is sufficient, and it does

15  not have -- materiality is not necessary nor does the attempted

16  influence need to, actually, come to fruition and be successful

17  in order for the two points to apply.

18      I do find, consistent with the Presentence Investigation

19  Report, because of the lengthy pretrial proceedings in this

20  matter, while the defendant attempted to obstruct justice in

21  June, primarily, of 2012, by June of 2013, when he plead guilty,

22  is one of those highly unusual cases where he gets acceptance of

23  responsibility.

24      So, I am allowing him the two points off for acceptance of

25  responsibility and an additional point for timely acceptance.

SENTENCING - SEPTEMBER 27, 2013
COURT'S ORAL DECISION RE:  OBJECTIONS TO THE PSIR

1    So, those are my findings with respect to your objection to

2    the obstruction of justice; and there are no other objections to

3    the Presentence Investigation Report.

4    So, with that comment I accept the Presentence

5    Investigation Report in total.

6    That leaves us, as calculated by the report, a Total

7    Offense Level of 21, Criminal History Category range V,

8    suggesting a guideline range of 70 to 87 months, a 1 to 3 year

9    term of supervised release, a 7500 to $75,000 fine range.

10   For the record, right now I'm waiving imposition of fine

11   because of the defendant's inability to pay.

12   I will give you further time to talk, Mr. Fischer; but I

13   want to narrow the subject of your argument.

14   So, at this point in time, I want to tell you that I am

15   rejecting departures from the guideline.  The Court has

16   considered the Government's upward departure motion and the

17   Presentence Investigation Report.  While I think the Court would

18   be justified in departing upward based upon lack of adequate

19   criminal history, I am not departing on that ground per se as a

20   departure from the guidelines.

21   Additionally, I think I could depart upward for the failure

22   of the guidelines to take into account the defendant's offense

23   conduct concerning failure to register as a sex offender.

24   Additionally, I think the Court could consider a departure

25   upward based upon the dangerousness of the bomb as -- as

1  designed as warranting an upward departure under 5K2.6 where

2  unusual nature of a weapon involved creates a particularly

3  dangerous device.

4      I am rejecting all of those.  However, I am still

5  considering an upward variance under 18 United States Code,

6  Section 3353.  And, so, at this time, I would hear from you as

7  to anything you want to tell me about my contemplation of an

8  upward variance, using the 3553(a) factors, in formulating an

9  offense, which must be sufficient but not greater than necessary

10 to comply with the purposes of sentencing considering all those

11 factors listed.

12     So, I'd hear your argument now with respect to variance.

13         MR. FISCHER:  Thank you, your Honor.  I think one of

14 the reasons, under the 3553(a) factors, the characteristics of

15 Mr. Pauckert, his history, his upbringing -- I -- I think it's

16 very important -- and I didn't learn this until late.  But

17 Mr. Pauckert was an adopted black child and was considered and

18 is considered a cocaine baby.  I provided materials for that.  I

19 didn't bring in an expert witness.  It's something for the Court

20 to consider that Mr. Pauckert was, potentially, and was more

21 susceptible to an addiction of his own coming from his childhood

22 and in the nature of his birth.

23     It also presents some variation in -- in cognitive

24 thinking, such as, having problems with social settings and,

25 also, compulsivity.

SENTENCING - SEPTEMBER 27, 2013
ARGUMENT RE: VARIANCE BY MR. FISCHER

1    I think one of the things that strikes me most is -- is,
2    watching the video and, also, looking at the PSI, is a mischief
3    -- a malicious mischief charge that Mr. Pauckert, initially,
4    suffered in 2000 -- I believe it was 2004 -- 2002 when he was --
5    when he was fighting with another individual over a girlfriend,
6    apparently, at school and that lead him to damage -- jump on a
7    car and start damaging a vehicle.

8    You know, since then, Judge, he -- in 2002 to 2006, he got
9    into some -- he got into two statutory rapes, a burglary, and
10   a -- a run through Montana where he was convicted.  And -- and,
11   from 2006, he's been sitting in jail and -- or coming out of
12   jail and trying to adjust to his life, which he just couldn't
13   get his head around.

14   Some of the letters indicate that he just wants to be a
15   normal guy.  Well, I'll get to bomb building as a normal guy in
16   a minute.  But I -- I think it's -- the revelations that, you
17   know, whether he's telling the truth or not or whether the
18   admissions he made to the -- to the probation officer from Idaho
19   that we just heard from, how all that occurred, why it occurred,
20   what the thought process was, whether he was changing a diaper
21   on a one-year-old or visiting, I have no idea.  I mean --

22   But what you see here is -- is that a young man who runs
23   afoul of the law.  And, in 2006, his -- his last conviction up
24   until now, he's -- he's -- he's building a bomb, possessing a
25   firearm, and with false ID kits.

SENTENCING - SEPTEMBER 27, 2013
ARGUMENT RE: VARIANCE BY MR. FISCHER

1      Now, you know, everybody could -- you can speculate, your

2  Honor, as to what this all means.  Do you -- do you put this all

3  together and speculate that he was going to run down to Las

4  Vegas after he bombed a building in Spokane and shot his way out

5  of the police department or something?  I mean, one could

6  speculate all over the place.

7      But the idea behind this was -- is that Mr. Pauckert was

8  tinkering with this stuff.  He was tinkering in making a bomb.

9  Now, what he was going to do with it he'll tell you.  He'll tell

10  you when he gets a chance to allocute.  But, surely, one can't

11  speculate that it was just something to blow up a person or at

12  an event or location.  That's one theory.  But there's nothing

13  else that lends to that theory.  These are all circumstances

14  that happened independently from each other.  And I don't see

15  how anybody could put them together to say that he was planning

16  or had an agenda for all this to -- to occur.

17      Was the bomb dangerous?  I think that nature and kind of

18  bomb, especially if you have shrapnel, certainly it's dangerous.

19  It's very dangerous.  And I -- I've known kids when I was 11 and

20  12 years old fooling around with dangerous stuff, trying to blow

21  up a shotgun shell, doing all crazy sorts of stuff.

22      This was -- the thing behind this, your Honor, is that

23  it -- when it was found, it wasn't loaded.  It wasn't loaded up.

24  The Pyrodex had been taken out.  It was not active.  Did it have

25  to be disarmed?  Certainly it did because they didn't know what

SENTENCING - SEPTEMBER 27, 2013
ARGUMENT RE: VARIANCE BY MR. FISCHER

1    was inside.  But what was inside was just a small residue of

2    powder.  That means that it had been used or attempted to be

3    used and, then, it was disarmed.

4        Why was it used?  What was the attempt?  It was Tyson Dodge

5    and Mr. Pauckert, but Mr. Pauckert at the helm, wanting to --

6    and -- and Cesley Dodge all looking at a video and seeing how

7    this could destroy inanimate objects.  There's nothing to -- to

8    show this Court that he intended to do anything other than that

9    with this bomb.

10       The video shows that Mr. Pauckert did a lot of good things

11   when he was growing up.  He had a nice family and a good

12   upbringing.  He hunted.  He fished.  He had access to firearms.

13   He had a loving grandparents.  And -- and would -- would

14   Mrs. Pauckert want to protect her son?  Sure.  But, you know,

15   going to the extent that -- that -- that she did something wrong

16   in his upbringing, he was -- he was brought up in a racially

17   charged Idaho school system.  And that's clear.  And does that

18   do something residual to this young man?  Well, that's how it

19   all started out and it continued and built and built.

20       And now he -- he gets involved with a family and goes out

21   and constructs a bomb, possesses a firearm, and the false ID

22   kits.  He's making for people that -- or attempts to make IDs

23   for a gaming -- or non-gaming card that can only be used in Las

24   Vegas to -- to get a job there.  Although he does have his

25   photographs on the computer, there's -- there's nothing --

1  everything else is speculation.  Maybe he was going to make an

2  ID to work in Las Vegas.  I have no idea.  I don't think anybody

3  can speculate.  But Mr. Pauckert will try to give you some

4  answers to that.

5      These survival kits and rape kits, more speculation.

6  Computer searches trying to turn this man into a malevolent

7  child pedophiliac.

8      I -- one can wildly speculate on all of this.  But, what

9  the facts show is that these are all independent acts from each

10  other.  Nothing was -- there was no agenda.  There was nothing

11  to suggest that he had any malevolence in his heart for anybody.

12  In fact, he loved -- and the letter suggests that, while he

13  stayed shortly with Cesley Dodge, he loved McKenzie and in a

14  proper way.  They talk all the time about each other.

15      Should he have not been doing that? Absolutely.  You know,

16  this is part of respect for the law.  That's one of the 3553(a)

17  factors, and I'm sure the Court is dealing -- trying to deal

18  with that and say, "Does he respect the law or not?"  Well,

19  obviously, when he takes off from a parole because he's afraid

20  of taking more -- some -- some instrument that's going to,

21  perhaps, show -- a lie detector that -- that parole uses, is he

22  going to fear from that?  Yes.  And, then -- and, then, he lives

23  with a woman who has a daughter.  He wants to be the normal guy.

24      Here's what I'm asking, Judge:  I -- that -- he's got a 2

25  to -- 2004 to 2006 criminal history.  He's an addict.  He has a

SENTENCING - SEPTEMBER 27, 2013
ARGUMENT RE: VARIANCE BY MR. FISCHER

1  high likelihood of being addicted again.  And, I think, he has

2  some -- he needs an evaluation, psychological evaluation.  I --

3  he's ready for that.  He wants to change his life around.  Even

4  his letters say, "I'm done with this."  When you read his

5  letters, you can -- you can see it in his own handwriting.  "I'm

6  done.  I -- I praise God.  I'm finished with this."  He's not

7  malevolent.

8         The thing is, your Honor, is -- is that now we're at 70 to

9  87 months.  I'm asking the Court to, when considering all these

10 factors and considering the fact that he has two cases out there

11 in Idaho and Montana that can revoke him so he can spend, at

12 least in -- in the Kootenai County case, he's been revoked now

13 until February of 2014.

14        In the Montana case, in Gallatin County, there's no telling

15 how much time he could get.  He's got to go back and face

16 these -- these cases, as well.  Who knows what additional state

17 charges could be brought in any place.

18        So, five years, your Honor.  I'm thinking five years, I

19 think, for this young fellow to get his life back in order and

20 to send a clear message to him that he has to respect the law

21 and that he can take some addiction classes under RDAP.  I

22 think -- I think that's a sufficient but not greater than

23 necessary.  It's five years out of a person's life.

24        Now, I'm going to ask the Court one other thing.  Because

25 of all this and because of the things that he's looking at in

SENTENCING - SEPTEMBER 27, 2013
ARGUMENT RE: VARIANCE BY MR. FISCHER

1  Montana and -- and Idaho again, I'm going to ask this Court to

2  run his federal time concurrent with other state cases that

3  could be implemented, other state charges -- or other state

4  sentences that could be likely implemented out of this.

5       Now, I know the Court doesn't control state courts; and the

6  state courts can, certainly, run these consecutive.  But, if you

7  take that step, your Honor, then, it makes clear to the

8  probation -- BOP that his time spent in these cases will be

9  easily adjusted.

10      So, I'd ask the Court to run his -- his sentence concurrent

11  with Kootenai County, CR-2006-3996, and Montana Gallatin County,

12  Case No. DC-05-094.

13      Once Mr. Pauckert squares his life away, he has children --

14  several children -- that he's got to man up and pay child

15  support and get back into their lives.  And that's exactly what

16  he wants to do.  That's what Mr. and Mrs. Pauckert -- his mother

17  and father are here in this courtroom today.  They are

18  grandparents who are taking care of some of his children.  They

19  see him on a -- routinely.  His ex-wife is here.  Mr. Pauckert's

20  ex-wife is here as is his sister.  They're very supportive of

21  this young man.

22      And I'm asking the Court to take all these circumstances

23  into account and not look at them as a malevolent monster

24  pedophile but a man that made some stupid blunders for -- for,

25  what I perceive such an intelligent person, blunders that he'll

SENTENCING - SEPTEMBER 27, 2013
ARGUMENT RE: VARIANCE BY MR. OHMS

1  regret for the rest of his life.

2          THE COURT:  Thank you, Mr. Fischer.  Mr. Ohms, I'll

3  hear from you, understanding that I have read your sentencing

4  memo.

5          MR. OHMS:  Thank you, your Honor.  I'll try to keep my

6  remarks brief, then, in light of that.  I don't think the

7  issue here is whether the defendant is a malevolent person.

8  That is where we venture off into speculation.

9      What we're looking at are his acts.  Defense asks us not to

10  speculate.  And I think the way you avoid that is by looking at

11  the search strings that the defendant created because that, more

12  than anything else, gives you direct insight into his state of

13  mind.  What were his interests?  What -- what is it that he was

14  focused on?

15      We have a case here where I think it would warrant a

16  sentence at the high end of the guideline range based upon two

17  of the factors under 3553.  One of those is adequacy of the

18  deterrence because, as the Court's heard from testimony today,

19  the defendant was not deterred at all from his prior contact

20  with the Court system.  In fact, he was on a fairly strict

21  regime of supervision with a number of specific conditions; and

22  those conditions included things like no possession of

23  pornography, setting completely aside the issue of whether it's

24  child pornography.  He had to have prior approval of

25  relationships.  All of that stuff was completely disrespected by

SENTENCING - SEPTEMBER 27, 2013
ARGUMENT RE: VARIANCE BY MR. OHMS

1  this defendant.

2      So, based upon the need for an adequate deterrence and,

3  also, I believe, to reflect the seriousness of the offense and

4  to promote respect for the law, this Court, I believe, should --

5  based on those -- sentence the defendant to the high end.

6      But I think that this really -- there's issues here that go

7  beyond that.  And, fundamentally, the question here is:  Does

8  the community require protection from this individual?  And, if

9  so, what is necessary and reasonable in order to accomplish

10 that?  And I believe that the answer to that question, based

11 upon the evidence, and -- and -- and the evidence is a defendant

12 that was non -- ultimately, noncompliant with his supervision.

13 He knew he was going to be found out and noncompliant in a

14 multitude of ways.  He was resistant to the polygraph;

15 ultimately absconds; becomes a fugitive; continues to live in a

16 relationship where a child was present in continuing in

17 violation of his supervision; takes up an illegal trade; obtains

18 a firearm; obtains ammunition.  And, you know, I asked Agent

19 McEuen about the money -- or the amount of money on that receipt

20 because -- I believe it was $80.  That's not a small amount of

21 money for a person who, based upon some of the defense material

22 that was provided, his principle problem was lack of employment.

23 This is a fairly conspicuous expense on his part, and it's

24 entirely illegal.  It's not just the firearm he can't possess,

25 but he can't possess the ammunition.

SENTENCING - SEPTEMBER 27, 2013
ARGUMENT RE: VARIANCE BY MR. OHMS

1     There's also an indication in some of the defense material

2 and, I think, it's kind of implicit in some of the questions

3 about the firearm being older; that somehow this is a -- a

4 relic, a museum piece.  But, if the Court would consider the

5 stipulated facts that are set forth in the plea agreement, on

6 Page 9 of the plea agreement, at the top of the -- top of the

7 page, it indicates that when witness -- "Witness 4 said that

8 approximately two weeks prior to the Defendant's arrest he heard

9 what appeared to be a car alarm and saw the Defendant go outside

10 with the handgun to investigate."  This was not a museum piece

11 that was going to be put in a -- on display somewhere.  This was

12 a functioning firearm that he treated as a -- as a weapon.

13     The Court -- I would encourage the Court not to consider

14 the events this case in isolation, but they have to be and

15 should be considered as a whole because it's really as a whole

16 that I think we're confronted with the need to protect the

17 community.

18     Based on those factors, your Honor, we're asking the Court

19 to sentence the defendant at the statutory maximum for Counts 1

20 and 2.  That's ten years.  The Court could go higher for

21 Count 5.  I don't -- I think that -- if we're looking at what is

22 necessary and reasonable, I think that the statutory maximum for

23 Counts 1 and 2 is appropriate.

24     The only additional thing I would ask the Court to

25 consider, I believe that it may be appropriate in this case, is

SENTENCING - SEPTEMBER 27, 2013
DEFENDANT'S RIGHT OF ALLOCUTION

1  the question of supervised release.  I think that's an important

2  issue with this defendant.  I think it's an important factor in

3  considering what may be necessary to protect the community.

4      If the Court were to consider sentencing the defendant to 3

5  years of supervised release on Counts 1 and 2 and impose a

6  3-year consecutive term of supervised release for Count 5, I

7  believe that that would be appropriate in this case, again,

8  for -- in the interests of protecting the community.

9      Thank you, your Honor.

10         THE COURT:  All right.  Thank you.

11     Mr. Fischer and Mr. Pauckert, please come forward.

12  Mr. Pauckert, this is a time called "allocution."  It's your

13  ability to tell me anything you want me to know prior to

14  pronouncing sentence.  I'll hear from you now.

15         THE DEFENDANT:  Okay.  Thank you, your Honor.  At the

16  time I had met Cesley, I'd known her since I was 13.  She's been

17  a friend of the family for as long as I can remember.  I was --

18  I was on parole when I met her, and I was also registered to go

19  to college in the spring.  We -- we started hanging out,

20  roughly, around August of 2011 and at -- at a bonfire.  It was

21  my sister's birthday party, and she was there.  I mean, she --

22  this is a friend that knows everything about -- everything about

23  our family.  I felt -- I felt pretty comfortable around her and

24  her family.  Her mom and her brothers all know me and knew --

25  knew the extent of my criminal record.

SENTENCING - SEPTEMBER 27, 2013
DEFENDANT'S RIGHT OF ALLOCUTION

1    So, as time went on, I got to be more comfortable around

2  them.  And, I mean, I -- I felt like we were going pretty good.

3  I felt like we had a -- a family.  She became pregnant later on,

4  and it was kind of, like, solidified the family unit together.

5    I -- we used her laptop to research a number of things.

6  One of our favorite shows to watch was "Doomsday Preppers" on

7  National Geographic.  And we saw on one where a family got

8  involved with, like, a malitia.  And me and her, I don't know,

9  that's just kind of our things.  Like I said, we met at a

10  bonfire, so ...

11    We researched the malitia thing online.  It was -- from

12  what I read on the -- their website, they offered a lot of

13  survival techniques; and we thought that was pretty cool.

14    She got a call from Marla Howard after I absconded, and she

15  was looking for me.  After that, we -- we went back onto her HP

16  laptop; and we researched, like, who -- who looked for parolees

17  absconding.  So, we -- we pulled up a list of, like, ideas,

18  like, who -- if the U.S. Marshals came to look for you or if

19  they sent out independent contracting, I don't know, officers.

20  So, this was all stuff that we researched.

21    We also researched how to make a bomb.  We saw on YouTube a

22  bunch of guys going out in the woods and blowing stuff up.  It

23  appealed to me and Tyson.  So, we started researching it more or

24  less.  On top of that, Rebecca Dodge used to work at an

25  explosive factory.  So, she told us everything there was to know

1  about explosives beforehand.  We further researched it.  And, I

2  mean, the searchs show just, like, how involved it was.

3      But our objective wasn't to harm anybody.  Like -- like Bob

4  said, I mean, we went out.  We were going to try to blow up a

5  watermelon.  I was going to use a piece of plywood -- a few

6  pieces of plywood at the house to -- as, kind of like, a

7  backdrop or something and, then, record it.  Our -- our

8  objective was to generate viewers on YouTube.

9      I did not know it was one directional.  That was not my --

10  my idea or implications for the device.

11      I did know I wanted to get as far away from it as possible.

12  So, that's why we used the remote door switch -- the doorbell

13  switch.

14      We tried to detonate it.  It didn't work.  I'm not an

15  explosives -- clearly, I'm not an explosives technician.  It

16  didn't work.  And, so, I -- I realized it was pretty stupid.  We

17  could get hurt.  And, moreover, somebody else could get hurt.

18  So, I decided to take it apart.

19      Once I got home, I took it apart.  I detonated the electric

20  fuse, or whatever they're calling it; and I threw it in the

21  trash -- or I threw most of the components in the trash that

22  housed the -- the black powder inside the IED.

23      It was -- it was dumb.  It was stupid, and that's exactly

24  why I started taking it apart.

25      The -- the gun, .38 Special, was originally something that

SENTENCING - SEPTEMBER 27, 2013
DEFENDANT'S RIGHT OF ALLOCUTION

1  Cesley and I researched.  She wanted something for protection.

2  She was -- at her work, she has to park in kind of a -- a

3  dim-lited (sic) parking lot at The Double Tree.  She has to park

4  in the Convention Center parking lot, and it's -- there's no

5  cameras.  And she's -- on top of that, she was pregnant.  So,

6  she's -- she's pretty afraid.  So, we started researching guns.

7  She applied for a permit, a concealed carry permit.  I don't

8  think it went -- it went through.

9      What we found online was a -- was, actually, a piece of

10  history.  And, in doing more research on it, I became more

11  fascinated by, like, just the history of World War II.  Like, I

12  thought it was -- I don't know, for a while there, still, pretty

13  fascinated with World War II and, like, how the events unfolded.

14  So, I thought it was pretty cool to have a 60-year-old handgun.

15  I also researched that it could sell for more than what I paid

16  for it.  I mean, it certainly wasn't anything -- the ring was

17  given to me.  So, for the trade, it was quite a deal.  So,

18  researching it, it was kind of fascinating just to have that

19  piece of history.

20      Tyson also wanted to learn how to shoot.  So, you know, we

21  brought him along.  He was kind of like the tagalong.  He was

22  part of the group.  And it's -- always Tyson was around.  He

23  helped me with a lot of stuff, like, fixing the vehicles; helped

24  me babysit McKenzie when Cesley went to work.

25      So, we arranged -- I arranged for the transaction between

SENTENCING - SEPTEMBER 27, 2013
DEFENDANT'S RIGHT OF ALLOCUTION

1  the ring and the firearm to go in Tyson's name.  Obviously, I

2  can't get it in my name.  And, so, I gave Tyson the ring to

3  give -- to trade for the firearm.  And, I mean, still, if he

4  wants it, he can have it.  Like, I really -- after researching

5  so much on the -- on the individual firearm, I was kind of sad

6  to see that it just would be lost.  I don't know where it goes

7  from here, but it certainly would be a waste.

8       One -- one time me and Cesley went out to try -- out in the

9  woods.  We tried to find a place to go shooting, And we couldn't

10  find a place.  So, on the way back, we stopped at Walmart to get

11  groceries.  I went in the grocery store, and I remembered that

12  I'd left the gun loaded.  I texted her, "Hey, look, the gun's

13  loaded just to let you know."  I went inside, bought the

14  groceries, and we went home.  I unloaded it at home.

15      As for the false identifications, I was -- I was making

16  them.  I was broke.  I'll admit it.  I was broke.  I was making

17  them for money.  I wasn't too proficient in making them.  I like

18  the attention I was getting from the college girls who wanted a

19  fake ID.  I thought it was cool.  Like, hey, you know, getting

20  all these numbers from these chicks.  And they're letting me

21  take their pictures for ID.

22      That idea didn't get too much farther than that because, if

23  it wasn't one thing, it was another with those printers.  I

24  couldn't -- it took me a while.  It's too tedious to be

25  feasible.  I -- I ended up making one for a friend and that,

SENTENCING - SEPTEMBER 27, 2013
DEFENDANT'S RIGHT OF ALLOCUTION

1 obviously, didn't get to him.  I was apprehended by the FBI.

2 But, yeah, the idea of making fake IDs was -- wasn't realistic.

3      Afterwards, Cesley -- after I got arrested, Cesley wanted

4 to know what -- what to do with all my stuff.  I told her she

5 could throw away -- she could box up most of my clothes, but she

6 could throw away the big printers -- the three printers if she

7 wanted to.  That was that.  I wasn't trying to -- I wasn't

8 trying to hide anything or intimidate anybody, but I left her

9 the option of that.

10      I freely admit that all that I did -- all I've done was

11 against the law.  Like, it was illegal to possess and to own

12 these things because they were illegal.  However, there wasn't

13 one -- there wasn't one common goal or idea for the evidence.  I

14 didn't intend to hurt anybody.  There was no common purpose for

15 the -- for the charges that are brought upon me.

16      I think the letters were taken out of context.  The gun was

17 in Tyson's name.  And -- and, like I said, if he wants it, he

18 can surely have it.  It would be a shame to see such a piece of

19 history go to waste.

20      The letters pertaining to the -- the custody battle between

21 Cesley and Brad, me and Cesley -- she was pregnant, and she was

22 afraid of losing her own child, her first child.  So, we were

23 brainstorming on ways how, you know, she could swing it to her

24 custody judge.  I really never meant to intimidate or hide

25 anything.  I was trying to -- I was really trying to calm her

SENTENCING - SEPTEMBER 27, 2013
DEFENDANT'S RIGHT OF ALLOCUTION

1  down because she was pregnant.  I didn't want that stress to

2  transfer to our child.  So, I just told her to minimize

3  everything.  I didn't want her to be as stressed out because I

4  could hear it in her voice.  And, when she came to see me, she

5  was stressed.

6      She stopped talking to me, though, altogether, abruptly,

7  around the beginning of September.  And I was, then, indicted in

8  December of that same year, 2012.

9      The BB gun I got -- it was -- it was a gift.  I got a gift

10 certificate from a client for plumbing, sorry.  And I used that

11 gift certificate for purchasing the BB gun that was found in

12 the -- one of the bags at the house.

13     Moreover, I'm extremely remorseful for everything that's --

14 that's happened.  I've -- this is not what I wanted for my kids.

15 Like, this is the worst of the worst situations.  My family --

16 like, I've put so much grief and strain on them.  I have a good

17 family.  I love them.  And this isn't what I want.  I see -- I

18 see the pain and stress in them every day.  I've made -- I've

19 made action to repair strained relationships.  And I'm just so

20 thankful that -- like, I'm overcome with emotion that -- to see

21 that they're even here in court today.  Like, it's -- it's

22 pretty awesome.  They're a good family.  I love them.

23     I understand that I could go away for a long time.  I know

24 how much time my sons have lost with me already.  And they're

25 walking.  They're talking now.  And I just -- I don't know.

SENTENCING - SEPTEMBER 27, 2013
DEFENDANT'S RIGHT OF ALLOCUTION

1  This could mean that they grow up without a father, and I don't

2  want that.  It's not fair to them.  And I've -- I've jeopardized

3  this opportunity for them to -- to have a father.  I've

4  jeopardized for them to turn to me for nurturing and advice and

5  parenting.  You know, I won't be able to teach them sports or --

6  or how to fish or what have you.

7       From what their moms telling me, they're -- they're pretty

8  active.  And they're -- they're really the ones that are missing

9  out on this.  I -- I so badly want to turn this all around, and

10 I want to -- I'm a strong worker.  Like, I'm not -- I'm not just

11 a piece of crap that -- that doesn't know how to work.  Like,

12 I -- I want to do this to help them because I hear the -- the --

13 the strain and the struggle in them, like, every time I talk to

14 them on the phone.  Like, their moms are just, like, "Man, where

15 are you at?  Like, this is not what I want."  It's not something

16 I want either, your Honor.

17      And, having struggled -- looking back, I've taken so much

18 from life.  I've taken so much from my parents already, my

19 family.  This has really pushed me to give -- to take a step

20 forward and give back, and now I want to do that.  Struggling

21 with addiction and cognitive problems my whole life, I want

22 to -- well, I've -- I've been able to reach out with a few young

23 men in jail.  And we kind of, like, discuss and talk about

24 problems.  And we question motives and actions that have lead us

25 to jail.  And, like, in doing so, it's -- it's brought resolve

1  to some of my own problems.

2      I've -- I aim to help others by pursuing a career in

3  chemical dependency and guidance counseling.  That's something I

4  really want to do.  Like, I thrive by helping others.  Like,

5  that's what I do.  Like, I thrive by helping other people.  It's

6  something I look forward to immersing my children in.  It's my

7  chosen career path.  Having newly become a father has completely

8  changed the way I think.  And it's no longer become about just

9  me.  Like, it's got me to look beyond the scope of just myself.

10     I -- I give you my word that I fully understand what I did

11 was against the law and illegal.  I also understand that I have

12 wronged my sons, their mothers, and my -- my family because of

13 -- because my actions have lead me to jail.  So, really, there's

14 two institutions wronged by me.  And I ask for mercy while

15 upholding a sentence from the courts so that -- so that I may

16 also uphold my duties as a father.

17     I've consumed such a pinnacle lesson here.  Like, it's

18 pushed me to pursue a more virtuous life.  And I, you know, I

19 honor the gift of fatherhood.  And I look forward to -- to

20 pursue a career and help them.

21     And that's all I have, your Honor.  Thank you.

22         THE COURT:  Mr. Pauckert, I'm going to put on the

23 record here that I'm not sentencing you because of your sex

24 offenses in Idaho.  The State of Idaho will take care of that.

25     Your sentence here that I will impose is in no way a

SENTENCING - SEPTEMBER 27, 2013
COURT'S ORAL DECISION

1  reflection of the punishment that you may or may not deserve

2  for those crimes in Idaho.

3       What I see here is, first of all and foremost, an immature

4  person, an immature lifestyle, a selfish person.  You say you

5  want to help people and help others, but I really find that

6  you're a selfish person; that you've gone from woman to woman to

7  woman.  You were adopted.  It seems to me that a person coming

8  from your background would realize the importance of having a

9  father and a mother and not having children through numerous

10 women.

11      But I think a selfish person when it comes to the sex

12 crimes in Idaho.  You became a fugitive.  And what concerns the

13 Court is, according to your mother, you became a fugitive on

14 March 28th when you left the house and never to return.  You

15 went to the Sharp Shooting Range three days later.  You, then,

16 went on Craig's List and obtained a firearm, an untraceable

17 transaction.  You talk about it as a piece of history, but those

18 firearms are a dime a dozen.  There's thousands of those out

19 there.  But, in your case, you purchased an untraceable firearm.

20      And you've admit and I find that it's your gun.  It was

21 your ring that was exchanged for it.  This receipt that you've

22 provided to me isn't worth the paper it's written on.  It

23 doesn't mean anything.  It doesn't mean anything to the Bureau

24 of Alcohol, Tobacco, and Firearms or anybody else because it's

25 an untraceable transaction; and it's not recognized by the law.

SENTENCING - SEPTEMBER 27, 2013
COURT'S ORAL DECISION

1  That was your gun.

2      You say your then-girlfriend wanted the gun for protection,

3  but it wasn't in her car.  It wasn't in her purse.  It was

4  downstairs, and it was loaded with ammunition.

5      You know, you can say that the Court's speculating as to

6  what you were going to do with all these implements.  But what's

7  significant to this Court is the chronology of events occurring

8  after you became a fugitive:  Immediately going to the Sharp

9  Shooting Range, immediately acquiring a firearm, building a

10  bomb.  That bomb is extremely dangerous.  You say you tried to

11  set it off.  If that is true, you're lucky you didn't kill

12  yourself.

13      But, for this Court to ignore your personal belongings,

14  your fake ID kit, your two other bags with implements of -- I

15  just call them criminal implements.  They're tools of crime.

16  There's no innocent purpose that those things would be gathered

17  together in bags together other than to commit a crime and to

18  become a successful fugitive.  It's inconceivable that I should

19  ignore those personal belongings, and it is not speculation that

20  you were on the road to harm somebody; whether it was yourself,

21  whether it was the occupants of your own house because --

22  because of an accidental discharge of that weapon, or the

23  accidental detonation of that bomb.

24      Just for my own purposes -- and there's no explanation, no

25  reasonable explanation, for your Internet searches of law

SENTENCING - SEPTEMBER 27, 2013
COURT'S ORAL DECISION

1   enforcement officers and law enforcement officers' homes.

2       I made a hypothetical.  And, so, I looked up, had you

3   killed somebody, whether it would be first-degree murder or

4   second-degree murder.  You'd be standing before me.  If it was

5   second-degree murder, it would be a level 38.  The guidelines

6   would take three points off because it's merely an attempt in

7   this case.  You did a substantial step toward the completion of

8   this hypothetical murder.  That would be a level 35.  If you

9   accepted responsibility, you'd be a level 32.  Your Criminal

10  History V dictates a sentence of 188 to 235 months.  That's what

11  would happen had the Government charged you under this

12  hypothetical second-degree murder.

13      It'd be even greater -- it'd be life in prison, nearly or,

14  if not, certainly, if it was first-degree murder.

15      It's inconceivable to me that you would become a fugitive

16  and, then, immediately get into this criminal behavior

17  especially, if I were to believe you, which I don't, that it was

18  innocent conduct.

19      I must decide the purposes of sentencing here:  Sufficient

20  but not greater than necessary.  It's got to reflect the

21  seriousness of the crime.  It's got to promote respect for the

22  law.  It's got to provide just punishment for the offense.  And,

23  most importantly here, it's got to deter your criminal conduct;

24  and it's got to protect the public from any future crime by you.

25      One of the factors this Court is required to consider under

SENTENCING - SEPTEMBER 27, 2013
COURT'S ORAL DECISION

1   the sentencing guideline is other sentences handed out for

2   similar conduct.  I can tell you I'm personally aware of 32-year

3   sentences.  No bomb going off, no one hurt, but a 32-year

4   sentence in another case.

5       I am aware of other sentences where the bomb's were

6   detonated where it was automatic life in prison in federal

7   court.  Several of those cases.

8       So, in terms of looking at other offenses, you're fortunate

9   you didn't hurt anybody.  You're fortunate it did not get

10  detonated.  But your conduct, your objectionable and objective

11  look at your criminal conduct deserves stringent punishment.

12      I know you can look at yourself and say you're a victim.

13  You know, it's the glass half empty or half full.  You can also

14  say, "I don't want to ever be there.  I don't want to ever have

15  a child that has to go to foster care.  I don't want to ever

16  have a child that doesn't have a father."  These are decisions

17  that you have to struggle with, and you have to make.  I can't

18  fix you.  I can't do it.  Only you can fix yourself.

19      I've considered all the factors of 18 United States Code

20  Section 3553.  I've indicated earlier that it would warrant an

21  upward departure from the guidelines.  But there's two ways to

22  get there, and I chose to get there by a variance.  I am

23  considering the nature and circumstances of the offense, the

24  seriousness of this offense, the objective to promote respect

25  for the law, to provide just punishment for this, to provide

SENTENCING - SEPTEMBER 27, 2013
COURT'S ORAL DECISION

1  adequate deterrence, and to protect the public from all future

2  crimes that you may decide or otherwise would have committed.

3       I also find in this case, but for law enforcement

4  intervention, it's clear to me that you had mortal intentions

5  with the above-described weapons.  There's no reason to have a

6  gun and a bomb unless you're going to use them to kill somebody.

7       And, as I've indicated, I calculated a hypothetical

8  guideline calculation for attempted second-degree murder; and it

9  would substantially exceed the sentence I'm going to give you.

10      Michael James Pauckert, it is the sentence of this Court,

11 having plead guilty to Counts 1, 2, and 5 of the Indictment,

12 Felon in Possession of a Firearm and Ammunition, Felon in

13 Possession of an Explosive, and Fraud and Related Activity in

14 Connection with Identification Documents, that you be sentenced

15 to the custody of the United States Bureau of Prisons for a term

16 of 144 months.  That's 120 months on Count 1, 120 months on

17 Count 2, 144 months on Count 5.  All run concurrent except, of

18 course, the 144 months on Count 5 is the longest.

19      The term of imprisonment imposed by this judgment shall run

20 consecutive to the defendant's term of imprisonment in the First

21 Judicial District Court, Kootenai County, Idaho, Case No.

22 CR-2006-2377 and CR-2006-3996.

23      I'll recommend you receive credit for the time you served

24 in federal custody prior to sentencing today, but that's a

25 matter for the Bureau of Prisons to decide.

SENTENCING - SEPTEMBER 27, 2013
COURT'S ORAL DECISION

1    I recommend that you participate in the BOP Inmate

2 Financial Responsibility Program.

3    I will remand you to the custody of the United States

4 Marshal at the conclusion of today's hearing.

5    With respect to supervised release, it's my -- I will

6 impose a three-year term of supervised release.  The statutes do

7 not allow me to stack those terms of supervised release,

8 although, I would if I could because I think you need the help

9 and assistance of a probation officer; not as punishment but as

10 a crutch.  Three years of supervised release on all three counts

11 to run concurrent.

12    While on supervised release, you shall not -- or excuse me.

13 For the rest of your life, you shall not possess a firearm,

14 ammunition, destructive device, or any other dangerous weapon.

15    You shall cooperate in the collection of a DNA sample.

16    You will be placed under the standard conditions of

17 supervision.  In this District, those are 13 standard

18 conditions.  Have you had a chance to review those with your

19 attorney?

20        THE DEFENDANT:  Yes, your Honor.

21        THE COURT:  All right.  I can read those to you, but

22 you'll get a copy of those.

23    I'm imposing three additional special conditions.

24 Condition No. 14, you shall submit your person, residence,

25 office, and vehicle to a search conducted by the U.S. Probation

SENTENCING - SEPTEMBER 27, 2013
COURT'S ORAL DECISION

1  Officer at a sensible time and manner based upon reasonable

2  suspicion of contraband or evidence of violation of a condition

3  of supervision.  Failure to submit to a search may be grounds

4  for revocation.  You shall warn persons with whom you share a

5  residence that the premises may be subject to search.

6      Condition No. 15, you shall abstain from the use of illegal

7  controlled substances and shall submit to testing, which may

8  include urinalysis or sweat patch as directed by your

9  supervising officer but no more than six tests per month in

10  order to confirm continued abstinence from these substances.

11      No. 16, you shall abstain from alcohol and shall submit to

12  testing, including urinalysis and breathalyzer, as directed by

13  your supervising officer but no more than six tests per month in

14  order to confirm continued abstinence from this substance.

15      I will impose a $100 special penalty assessment for each of

16  the three counts for a total of $300.  That is due immediately.

17  If you don't have the money to pay that immediately, you shall

18  pay not less than $25 per month while you are incarcerated.

19  After your release from prison, you shall -- if you still owe

20  monetary penalties, you shall pay not less than $25 per month or

21  ten percent of your net household income, whichever is larger,

22  commencing 30 days after your release from prison.

23      You shall forfeit a six shot, .38 caliber, Smith & Wesson

24  revolver, Serial No. V 448122, and a -- and 50 Remington .38

25  caliber rounds of ammunition.

SENTENCING - SEPTEMBER 27, 2013
COURT'S ORAL DECISION

1    I previously indicated and I do waive the imposition of a

2  fine.  I find that you don't have any present ability to pay a

3  fine, and any money that you do earn should be given to your

4  dependents.

5    This is a statement above the advisory guideline range.

6  It's called a variance from the sentencing guidelines.  The

7  Court is not bound by the sentencing guidelines.  They're mere

8  suggestions at this point.  I have considered all the factors of

9  the sentencing statute, 18 United States Code Section 3553(a);

10  and I will provide a written -- further written justification as

11  to the nature of the variance from the guidelines in this case

12  in addition to my statements here on the record.

13    I am remanding you to the Marshal's service.  And I also

14  advise you you have a right to an attorney if you desire to

15  appeal this sentence.  Mr. Fischer will remain your attorney for

16  that -- for purposes of you filing a Notice of Appeal.  That

17  must be done within 14 days if you desire to appeal this

18  sentence.

19    On the Government's motion, I'll dismiss Counts 3 and 4 of

20  the Indictment.  Mr. Ohms?

21    MR. OHMS:  The Government so moves, your Honor.

22    THE COURT:  And, Mr. Ohms, is there anything else in

23  that forfeiture provision that you want forfeited?  I've only

24  forfeited the firearm and the 50 rounds of ammunition.

25    MR. OHMS:  I don't believe that there was anything

SENTENCING - SEPTEMBER 27, 2013
COURT'S ORAL DECISION

1  else listed in the forfeiture notice of the Indictment, your

2  Honor.

3          THE COURT:  Well, I think the bomb components were;

4  but he also agreed to relinquish those.  If you don't want an

5  official forfeiture, that's fine with the Court.

6          MR. OHMS:  Your Honor, I think we're satisfied with

7  the forfeitures the Court's pronounced.

8          THE COURT:  All right.  Mr. Pauckert, this Court will

9  be here when you are released from prison and while you're

10  placed on supervised release.  You've got a lot of growing up to

11  do, and I hope that you take advantage of that in prison and

12  take advantage of the counseling, treatment, and training that

13  they provide.  The Court's not sentencing you for that purpose,

14  but that's something you can take advantage of while you're in

15  prison.

16          THE DEFENDANT:  You have my word.

17          THE COURT:  You can also get in there and talk to

18  other convicts and become sour and bitter, and you could start

19  blaming everybody else for your problems.  But I hope that you

20  mature well enough to realize that you're responsible for your

21  own actions and that you can still make a good life.

22      All right.  Anything further, Mr. Fischer?

23          MR. FISCHER:  No, your Honor.

24          THE COURT:  Anything further, Mr. Ohms?

25          MR. OHMS:  No, your Honor.  Thank you.

SENTENCING - SEPTEMBER 27, 2013
COURT'S ORAL DECISION

1          THE COURT:  All right.  We're in recess.

2      (Court adjourned at 12:05 p.m.)

1              C E R T I F I C A T E

2

3        I, RONELLE F. CORBEY, do hereby certify:

4        That I am an Official Court Reporter for the United States

5    District Court for the Eastern District of Washington in

6    Spokane, Washington;

7        That the foregoing proceedings were taken on the date and

8    at the time and place as shown on the first page hereto; and

9        That the foregoing proceedings are a full, true and

10    accurate transcription of the requested proceedings, duly

11    transcribed by me or under my direction.

12        I do further certify that I am not a relative of, employee

13    of, or counsel for any of said parties, or otherwise interested

14    in the event of said proceedings.

15        DATED this 6th day of November, 2013.

16

17

18                              */s/ Ronelle F. Corbey*

19                              RONELLE F. CORBEY, RPR, CSR
                                Official Court Reporter for the
20                              U.S. District Court in
                                Spokane County, Washington
21

22

23

24

25

1                        <u>**GENERAL INDEX**</u>

2                                                       <u>**PAGE**</u>

3     Sentencing - September 27, 2013...................... 2

4     Government Calls Witnesses........................... 4

5     Government Rests.................................... 72

6     Objections to the Presentence Investigation Report ... 73

7     Court's Oral Decision Re:  Objections to the PSIR..... 78

8     Argument Re:  Variance by Mr. Fischer................ 82

9     Argument Re:  Variance by Mr. Ohms.................. 89

10    Defendant's Right of Allocution..................... 92

11    Court's Oral Decision.............................. 100

12    Reporter's Certificate............................. 111

13

14                        <u>**WITNESS INDEX**</u>

15    <u>**PLAINTIFF WITNESSES:**</u>                        <u>**PAGE**</u>

16    LELAND McEUEN           DIRECT BY MR. OHMS      4
                              CROSS BY MR. FISCHER    26
17                            REDIRECT BY MR. OHMS    53

18    MARLA HOWARD            DIRECT BY MR. OHMS      55
                              CROSS BY MR. FISCHER    70
19

20    <u>**DEFENDANT WITNESSES**</u>                        <u>**PAGE**</u>

      None
21

22

23

24

25

## EXHIBIT INDEX

| NO. | DESCRIPTION | ADMITTED |
|---|---|---|
| 1 | Photo:  Computer Case in Garage | 3 |
| 2 | Photo:  X-ray of Explosive Device in Computer Case | 3 |
| 3-a | Photo:  Explosive Device | 3 |
| 3-b | Photo:  Explosive Device.  (Alternate View, Color) | 3 |
| 4 | Photo:  Explosive Device.  Detail of Toolmarks | 3 |
| 5 | Photo:  Explosive Device Components.  Pryodex Power, Doorbell Switch, Christmas Lights | 3 |
| 6 | Photo:  Handgun | 3 |
| 7 | Photo:  Contents of "Green" bag.  Pellet Gun, Condom, Latex Gloves, Flashlight | 3 |
| 8 | Photo:  Contents of "Camo" Bag.  Flex Cuffs, Adhesive Tape, Flashlight, Stocking Mask, Maps | 3 |
| 9 | Receipt:  Indoor Shooting Range and Gun Shop. Purchase of Ammunition, Eye Protection, Ear Protection, and Target (03/31/12) | 3 |
| 10 | Photo:  Creative Memories Bag Containing Materials for the Manufacture of Identification Documents | 3 |
| 11 | Photo:  "Washington" Stencil | 3 |
| 12 | Photo:  Counterfeit Identifications | 3 |
| 13 | Summary Charts:  "Searches Conducted by Computer User" prepared by SABT Leland McEuen Summarizing Evidence of "Search Strings" Found on Acer Netbook and HP Laptop Computers | 3 |
| 14 | Handwritten Letter Dated "June 13" | 3 |
| 15 | Handwritten Letter dated "6-14" | 3 |